UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

(1) DANA A. PULLMAN and
(2) ANNE M. LYNCH,

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Criminal No. *19cr10345*

Violations:

Count One: Racketeering Conspiracy
(18 U.S.C. § 1962(d))

Count Two: Racketeering
(18 U.S.C. § 1962(c))

Count Three: Conspiracy to Commit Honest
Services Wire Fraud
(18 U.S.C. § 1349)

Count Four: Honest Services Wire Fraud;
Aiding and Abetting
(18 U.S.C. §§ 1343, 1346 and 2)

Counts Five through Nine: Wire Fraud; Aiding
and Abetting
(18 U.S.C. §§ 1343 and 2)

Counts Ten and Eleven: Obstruction of Justice;
Aiding and Abetting
(18 U.S.C. §§ 1503(a) and 2)

Count Twelve:  Conspiracy to Defraud the
United States
(18 U.S.C. § 371)

Counts Thirteen through Eighteen:  Aiding and
Assisting the Filing of a False Tax Return
(26 U.S.C. § 7206(2))

Forfeiture Allegation:
(18 U.S.C. §§ 981(a)(1)(C), 1963 and
28 U.S.C. § 2461)

1

INDICTMENT

At all times relevant to the Indictment:

General Allegations

*The State Police Association of Massachusetts*

1.      The State Police Association of Massachusetts ("SPAM") was an association consisting of more than 1,500 Troopers and Sergeants from the Massachusetts State Police ("MSP"). SPAM had its principal offices at 11 Beacon Street, Suite 700, Boston, Massachusetts. SPAM acted as the exclusive bargaining agent between its members ("the Membership") and the Commonwealth of Massachusetts ("the Commonwealth") regarding the terms and conditions of the Membership's employment. SPAM constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a legal entity that engaged in, and whose activities affected, interstate commerce.

2.      SPAM had four Constitutional Officers: President, Vice President, Treasurer and Secretary. The President and Treasurer of SPAM held those positions full-time. Under the terms of SPAM's By-Laws, the President had "general supervision over the affairs of the Association." Upon election, the President and Treasurer held office for two-year terms.

3.      The President of SPAM also served as the Chairman of the Executive Board ("E-Board"). The E-Board consisted of the four Constitutional Officers and approximately eleven representatives of the various troops of the MSP ("Troop Reps"). Upon election, the Troop Reps held office for one-year terms.

*SPAM's Finances*

4.      SPAM's primary source of income was the dues the Membership paid to SPAM. Upon graduation from the MSP Academy, the vast majority of new MSP troopers became members of SPAM and paid dues to SPAM through automatic deductions from their paychecks.

5.      Among the more significant expenses that SPAM incurred and reported to the Membership were the salaries it paid to the E-Board members and professional fees paid to attorneys and a lobbying firm pursuant to retainer agreements.

6.      In addition to their regular MSP salary, SPAM paid each Constitutional Officer and Troop Rep a SPAM salary and a $1,000 quarterly stipend.  Members of the E-Board could also receive reimbursement checks for SPAM related expenses such as meals, travel, and mileage for the use of their personal vehicles for SPAM business by submitting expense reports, often called "rip sheets," to SPAM's Treasurer.  In addition to their purported expense reimbursements, the President and Treasurer each had a SPAM debit card, linked to a SPAM bank account, for SPAM related travel and business.

7.      Each year, a local accounting firm ("the CPA Firm") audited SPAM's finances.  At the close of each calendar year, the CPA Firm presented audited financial statements to the E-Board for their signature and approval.  Thereafter, at the beginning of each following year, the CPA Firm presented condensed versions of the audited financial statements to the Membership at SPAM's annual meeting.

*The E-Board*

8.      The E-Board met twice a month and maintained records of their meetings, votes and decisions through minutes prepared by the Secretary.  According to SPAM's By-Laws, the E-Board had "the entire charge, control and management of the SPAM, including its business, property and affairs[.]"      Furthermore, under its By-Laws, at all meetings of the SPAM Membership and of the E-Board, only "a majority of the Association members in good standing of each body present and voting [had] the power to transact business and to determine the disposition of any matter properly presented at such meeting[.]"

9.      While not specifically required under SPAM's By-Laws, it was the regular practice and expectation of the E-Board to consider, vote on, and approve significant expenditures of SPAM funds outside normal and expected operational costs.  Expenditures that were routinely presented to and voted on by the E-Board included charitable donations over approximately $500.

10.      In addition to bi-monthly E-Board meetings, SPAM also held an annual meeting of the Membership in January at a hotel in Framingham, Massachusetts.  The annual meetings included presentations from SPAM's Constitutional Officers, the CPA Firm regarding SPAM's financial position as compared to the previous year along with condensed financial statements of revenue and expenses, and a lobbying firm regarding legislation and other issues affecting the Membership.

*SPAM's Lobbying Firm*

11.      The "Lobbying Firm" was a lobbying and public relations firm based in Boston, Massachusetts.  Since approximately 2008, the Lobbying Firm represented SPAM before

4

government agencies and legislative committees and advocated regarding issues and state legislation on SPAM's behalf.   SPAM paid the Lobbying Firm a monthly retainer fee of approximately $7,000 for lobbying work and beginning in approximately 2016 paid the Lobbying Firm an additional $2,500 per month for public relations work.

12.     The Lobbying Firm was an S-Corporation ("S-Corp") under the Internal Revenue Code.  As an S-Corp, the Lobbying Firm was not required to pay any federal income taxes.  Instead, taxable income passed through the Lobbying Firm to its individual shareholders, documented on an Internal Revenue Service ("IRS") Schedule K-1 ("K-1").   Any individual tax payer who received a K-1 from the Lobbying Firm was required to accurately report the income from the K-1 on their U.S. Individual Tax Return, IRS Form 1040.

13.     After the close of each fiscal year, the Lobbying Firm was also required to file a U.S. Income Tax Return for an S-Corp., IRS Form 1120S with the IRS.

*The Defendants*

14.     Defendant DANA A. PULLMAN ("PULLMAN") first joined the MSP as a trooper in approximately 1987 and was the President of SPAM from approximately 2012 until on or about September 28, 2018.   Prior to becoming President, from approximately 2008 until 2012, PULLMAN was SPAM's Treasurer.    As a law enforcement officer and the President of SPAM, PULLMAN owed a fiduciary duty and a duty of honest services to SPAM, the Membership, and the Commonwealth to perform his job and official duties free from fraud, deceit, and self-enrichment and to refrain from accepting, or agreeing to accept bribes and kickbacks.

15.     Beginning in at least 2015 and continuing through at least 2017, PULLMAN and his spouse filed joint federal income tax returns (IRS Form 1040) with the IRS.  For each of the tax years for which he filed a joint federal income tax return with the IRS, including the tax years 2014 and 2016, PULLMAN declared under penalty of perjury, that the information submitted in each of the tax returns was true, correct and complete.

16.     Defendant ANNE M. LYNCH ("LYNCH") founded the Lobbying Firm in approximately 2001 and until approximately October 2016 was its principal owner.  LYNCH was a long-time friend of PULLMAN and often coordinated fundraisers for political candidates supportive of the MSP for SPAM.  Following her retirement from the Lobbying Firm, effective as of approximately October 2016, LYNCH sold the business to two family members, but continued to work for the Lobbying Firm as a paid consultant, including performing work for SPAM.

17.     For the tax years 2013, 2014, 2015 and 2016, the Lobbying Firm filed IRS Forms 1120S.  As to the IRS Forms 1120S filed for tax years 2013, 2014 and 2015, LYNCH declared on behalf of the Lobbying Firm, under penalty of perjury, that the information submitted in each of the tax returns was true, correct and complete.

18.     Beginning in at least 2015, LYNCH filed individual federal income tax returns with the IRS.  For each of the tax years for which she filed an individual federal income tax return with the IRS, including the tax year 2015, LYNCH declared under penalty of perjury, that the information submitted in each of the tax returns was true, correct and complete.

*Other Relevant Individuals and Entities*

19.     "The Treasurer" was a member of the MSP and SPAM's Treasurer from approximately 2012 until June 2019.

20.     "The Lobbyist" was one of LYNCH's family members who had worked for the Lobbying Firm since approximately 2011.  After purchasing the firm with another family member from LYNCH in approximately October 2016, the Lobbyist became a partner of the Lobbying Firm.

21.     "SPAM Attorney #1" was an attorney on retainer for SPAM who provided legal representation for SPAM members and represented SPAM during the federal grand jury investigation into SPAM that began in approximately July 2018.

22.     "SPAM Attorney #2" was another attorney on retainer for SPAM who in approximately November 2016 hired the Lobbying Firm to assist SPAM Attorney #2 in applying for a marijuana dispensary license.

23.     "Individual #1" was an individual with whom PULLMAN had a romantic relationship between in or about 2016 and 2018 and who did not work for SPAM or the Lobbying Firm.

24.     "Company A" was a company based in New York that developed, marketed and sold computer software products to law enforcement agencies.  "Employee A" was one of the founders and owners of Company A.

25.     "Company B" was a company based in Arizona that marketed and sold smart weapons to law enforcement agencies. "Employee B" was a regional sales manager for Company B.

Relevant Background

*The $20,000 Payment to PULLMAN from the DOL Settlement*

26.     In approximately 2005, SPAM filed a grievance on behalf of the Membership with the MSP that alleged that the MSP had not properly compensated MSP employees for working scheduled days-off (referred to as "days-off lost," or "DOLs"). While the grievance was stalled for several years, it was ultimately resolved through a written settlement in 2014.

27.     In support of the grievance, beginning in approximately 2012, SPAM rented additional office space and hired temporary employees as well as the Lobbying Firm to conduct the collection and review of MSP employees' (and former employees') records and calculate a total amount of days-off lost ("the DOL Project") for which the Membership would be compensated.

28.     In approximately July 2013, the Commonwealth of Massachusetts, acting through the MSP and others, and SPAM reached a tentative multi-million dollar settlement. Ultimately, the Commonwealth agreed to pay the participants in the DOL settlement more than $22 million. As part of the settlement, the Commonwealth also agreed to pay SPAM $350,000 for a portion of the expenses SPAM purportedly incurred in pursuing the grievance.

29.     Between approximately July 2013 and August 2014, PULLMAN, LYNCH and the Lobbyist negotiated the final terms of the DOL settlement with representatives from the MSP and

8

the Commonwealth. During this process, PULLMAN negotiated for a provision of the agreement that would enable SPAM to recover at least a portion of the approximately $700,000 in expenses PULLMAN claimed that SPAM had incurred in pursuing the grievance.

30.     The agreement became final on or about August 7, 2014 ("the DOL Settlement"). Signed by PULLMAN on behalf of SPAM, the DOL Settlement included a provision that required the Commonwealth "to compensate SPAM $350,000 for costs incurred in pursuing this matter."

31.     Before the DOL Settlement had been finalized, between June 2013 and February 2014, SPAM had paid the Lobbying Firm a total of $100,000 for its work on the DOL Project. After SPAM's receipt of $350,000 from the Commonwealth in accordance with the DOL Settlement, on or about November 5, 2014, SPAM issued a $250,000 check payable to the Lobbying Firm for "DOL Project Final Payment."

32.     On or about November 10, 2014, LYNCH handwrote a $50,000 check, payable to herself from the Lobbying Firm's bank account and originally classified on the Lobbying Firm's records as an "Owner's Draw." The next day, on or about November 11, 2014, LYNCH deposited the $50,000 check into her personal bank account and wrote a $20,000 check to PULLMAN's spouse that was later deposited into PULLMAN's joint personal bank account.

33.     Between September 2015 and November 2015, following an inquiry from the Lobbying Firm's accountant, the classification of LYNCH's $50,000 "Owner's Draw" was changed on the Lobbying Firm's records to a $50,000 payment to PULLMAN's spouse as a

"consulting fee," even though neither PULLMAN nor his spouse ever did any consulting work for the Lobbying Firm and the check payable to PULLMAN's spouse was $20,000 and not $50,000.

34.     PULLMAN purposely omitted the payment as income on his 2014 joint personal tax return, and knowingly and fraudulently concealed the $20,000 bribe and kickback from SPAM, the Commonwealth and the Membership.

35.     For example, during a regular E-Board meeting in or about July 2014, PULLMAN informed the E-Board that SPAM was going to get back $350,000 from the Commonwealth as part of the DOL Settlement, but never made any mention to the E-Board, the Membership, the MSP or the Commonwealth about his receipt of a $20,000 bribe and kickback from the $350,000 reimbursement.

36.     In addition, in his bid for election as SPAM President in the November 2015 edition of the SPAM Trooper Newspaper, PULLMAN touted the DOL settlement as *one of this association's biggest accomplishments ever,"* thanked LYNCH and the Lobbyist for their work on the DOL Project and claimed that the Lobbying Firm saved SPAM upwards of $6 million in legal fees and litigation costs.  PULLMAN did not make any mention of his own additional $20,000 compensation from the settlement in the form of the bribe and kickback from LYNCH.

37.     The Commonwealth would not have engaged in negotiations with PULLMAN, LYNCH and the Lobbying Firm, and would not have agreed to pay SPAM $350,000 for expenses, had it been aware that PULLMAN was going to receive a $20,000 bribe and kickback from LYNCH and the Lobbying Firm.

*The $5,000 Payment to PULLMAN for the $20,000 Contract with Company A*

38.     By at least 2014, Company A was developing and marketing computer software programs, CAD (Computer Aided Dispatch) and RMS (Records Management System), to various law enforcement agencies including the MSP.

39.     In or about March 2014, a member of the MSP involved in law enforcement technology encouraged Employee A to make a presentation to PULLMAN in order to foster PULLMAN's and SPAM's support for their product and Company A.

40.     Around the same time, the Executive Office of Public Safety and Security ("EOPSS") for the Commonwealth issued a request for bids for CAD and RMS software solutions. Specifically, on or about April 30, 2014, EOPSS publically issued a Request for Response ("RFR") for written proposals for a "CAD/RMS Modernization Solution." The deadline for the RFR submission was originally July 30, 2014, but was later extended to August 27, 2014.

41.     On or about July 25, 2014, at SPAM's offices in Boston, Employee A gave PULLMAN and the Treasurer a short demonstration of Company A's product and described the company's vision for a CAD/RMS system. Following the presentation, PULLMAN encouraged Employee A and Company A to hire LYNCH and the Lobbying Firm in order to help Company A prepare and submit a response to the RFR.

42.     On or about July 26, 2014, at approximately 3:18 p.m., in response to an email to PULLMAN and the Treasurer thanking them for the meeting the day before, PULLMAN informed Employee A that LYNCH would soon be contacting Employee A and described LYNCH as *"a true expert in the state of Mass procurement process[.]"*

11

43.     On or about August 11, 2014, LYNCH and the Lobbyist met with Employee A about the RFR at SPAM's Offices in Boston. Days before the meeting, on or about August 7, 2014, at approximately 6:18 p.m., LYNCH emailed Employee A and indicated that they had reviewed the RFR and were *"prepared to offer some meaningful insights on your submission options."*

44.     Thereafter, Employee A, on behalf of Company A, entered into a written contract with the Lobbying Firm whereby Company A agreed to pay the Lobbying Firm $20,000 for professional services including preparation of Company A's response to the RFR.

45.     On or about August 18, 2014, the Lobbying Firm emailed a $20,000 invoice to Company A. On or about September 14, 2014, Company A paid the invoice via a $20,000 wire transfer from Company A in New York through Company A's bank account in California to the Lobbying Firm's bank account at Boston Private Bank and Trust in Boston, Massachusetts.

46.     On or about August 20, 2014, the Lobbying Firm issued a $5,000 check to PULLMAN, later deposited into PULLMAN's joint personal checking account, in exchange for PULLMAN's directing Company A to hire the Lobbying Firm. The check was described as a "commission expense" on the Lobbying Firm's records.

47.     PULLMAN and LYNCH purposely concealed the Lobbying Firm's payment to PULLMAN from Employee A and Company A. Employee A and Company A would not have paid the Lobbying Firm $20,000 had it known about the illicit arrangement between PULLMAN, LYNCH, and the Lobbying Firm. PULLMAN and LYNCH also purposely concealed the

Lobbying Firm's payment to PULLMAN from SPAM and the Membership in violation of PULLMAN's fiduciary duties and duty of honest services.

*The $5,000 Payment to PULLMAN for the Smart Weapon Contract with Company B*

48.     Between in or about April 2015 and February 2016, Employee B attempted to market and sell smart weapons to both the MSP and the Massachusetts Department of Corrections ("DOC").

49.     On or about April 9, 2015, Employee B met with PULLMAN and the Treasurer at SPAM's offices in Boston to discuss the possibility of Company B entering into a contract to sell smart weapons to the MSP. The proposed contract was for the full deployment of smart weapons to each member of the MSP and was potentially worth millions of dollars. During the meeting, despite the fact that Company B already had a Boston area lobbying firm on retainer, PULLMAN pressured Employee B to hire LYNCH and the Lobbying Firm. Among other things, PULLMAN told Employee B that LYNCH and the Lobbying Firm could assist Company B in obtaining appropriations from the Massachusetts state legislature to fund the purchase of smart weapons for the MSP. Based on PULLMAN's words and actions, Employee B believed that Company B would not be able to sell smart weapons to the MSP if it did not hire LYNCH and the Lobbying Firm.

50.     Between in or about October 2015 and May 2016, Company B paid the Lobbying Firm a total of $138,000, purportedly for the Lobbying Firm's efforts to lobby the state legislature for an appropriations bill to fund smart weapons for the MSP. However, by June 2016, legislative funding for smart weapons was no longer feasible and Company B discontinued their contract with the Lobbying Firm.

51.     Apart from Company B's efforts to sell smart weapons to the MSP, Employee B, on behalf of Company B, was also attempting to market and sell smart weapons to the DOC. On or about February 11, 2016, the Lobbyist and Employee B met with the then Undersecretary of Criminal Justice within EOPSS ("the Undersecretary") about the potential sale of smart weapons to the DOC. The same day, after the meeting, the Lobbyist sent a text message to PULLMAN thanking him for arranging the meeting and wrote, *"Unbelievable meeting with [the Undersecretary]. Thank you!"*

52.     On or about February 22, 2016, LYNCH paid PULLMAN $5,000 for PULLMAN's dealings with Company B - including directing Company B to the Lobbying Firm and arranging the meeting between Employee B and the Undersecretary.  LYNCH made this payment to PULLMAN by writing a $5,000 check payable to herself from the Lobbying Firm's account on or about February 15, 2016 that was falsely characterized on the firm's records as a payment to "Boston Consulting Group" for a "consulting fee."  LYNCH subsequently wrote a $5,000 check drawn on her personal account payable to PULLMAN which was deposited into PULLMAN's joint personal bank account.

53.     PULLMAN, LYNCH and the Lobbying Firm concealed this payment from Company B. Employee B and Company B would not have not have entered into a contract with the Lobbying Firm and paid it a total of $138,000 had it known about the illicit arrangement between PULLMAN, LYNCH, and the Lobbying Firm. PULLMAN and LYNCH also purposely concealed the Lobbying Firm's payment to PULLMAN from SPAM and the Membership in violation of PULLMAN's fiduciary duties and duty of honest services.

14

*PULLMAN's Fraudulent Misuse and Embezzlement of SPAM Funds*

54.     While President of SPAM, PULLMAN purposely and fraudulently embezzled and misused SPAM funds through the use of SPAM debit cards, reimbursement checks, and by circumventing and bypassing the role of the E-Board and the CPA Firm.

55.     Between at least January 2014 through at least August 2018, PULLMAN knowingly used SPAM debit cards linked to SPAM checking accounts for personal spending that PULLMAN concealed from SPAM, the E-Board and the Membership including, but not limited to, the following:

a.      Between in or about May 2015 and August 2018, PULLMAN used SPAM debit cards to purchase approximately $9,300 in flowers and gift baskets from Winston Flowers for family and friends unrelated to SPAM business, including more than approximately $4,400 in flowers and gifts for Individual #1.

b.      Beginning sometime in or about 2016 and continuing until August 2018, PULLMAN used SPAM debit cards to pay for more than $8,000 in personal meals with Individual #1 at restaurants in the Boston area as well as for meals with PULLMAN's family near his residence unrelated to SPAM business.

c.      On or about October 18, 2016, PULLMAN used the SPAM debit card to pay approximately $468 for a lunch with Individual #1 at Marea restaurant in New York, including approximately $150 for caviar that PULLMAN falsely claimed was related to a National Trooper Coalition ("NTC") meeting.

d.      Between in or about February 17, 2017 and March 1, 2017, PULLMAN

used the SPAM debit card to pay approximately $276 to American Airlines for a flight from Boston

to Miami, Florida; $385 for Lure Fishbar restaurant in Miami Beach, Florida; $829 to Hertz Rent-

A-Car in Miami, Florida; and $2,113 to the Palms Hotel in Miami Beach, Florida for a personal

getaway with Individual #1 that PULLMAN falsely claimed was related to a NTC meeting.

e.      Between in or about January 2014 and July 31, 2018, PULLMAN used the

SPAM debit card to pay approximately $2,000 for iTunes charges unrelated to SPAM business.

56.     Moreover, PULLMAN frequently obtained reimbursement checks and other

personal benefits without following the established procedures and without the approval of the E-

Board.  For example, in 2016, PULLMAN received more than $40,000 in expense reimbursement

checks although PULLMAN submitted expense sheets to the Treasurer for less than $9,000 of

those purported expenses.

57.     PULLMAN also frequently bypassed the E-Board and caused significant

expenditures of SPAM money to be paid to third parties.  For example, on or about March 28,

2017, PULLMAN signed a $10,000 check payable to a Quincy, Massachusetts non-profit

organization from SPAM's bank account at Eastern Bank.  The check was for a charitable donation

that included the purchase of a 10-person table and dinner at the organization's annual gala charity

event in Boston, Massachusetts.  PULLMAN did not seek or obtain the approval of the E-Board

for this expenditure, as required and attended the event with Individual #1.

58.     In or about November 2017, PULLMAN and the Treasurer leased a 2017 Chevrolet

Suburban valued at approximately $75,760 in PULLMAN's name by issuing two checks from

SPAM's bank account totaling $21,371 as a down payment without the approval or knowledge of the E-Board.

59.     As President of SPAM and the leader of the E-Board, PULLMAN also at times encouraged the members of the E-Board to submit false reimbursement requests to cover personal expenses that should not have been reimbursed by SPAM, including personal meals and political donations. Several members of the E-Board followed PULLMAN's guidance and submitted false expense reimbursement requests to the Treasurer.

*PULLMAN and LYNCH's Efforts to Obstruct Justice*

60.     Between on or about September 18, 2018 – when SPAM received a grand jury subpoena for records relating to expense reimbursements – and on or about September 28, 2018, when PULLMAN resigned as President of SPAM, PULLMAN contacted SPAM Attorney #1, an attorney representing SPAM in the grand jury investigation, and asked whether SPAM Attorney #1 would speak to LYNCH. Shortly thereafter, LYNCH contacted SPAM Attorney #1 and asked that SPAM Attorney #1 delay the production of subpoenaed records to the United States Attorney's Office, because she was helping PULLMAN in collecting receipts for his expenses.

61.     On or about August 2, 2018, the Treasurer searched the SPAM offices but was unable to locate the SPAM E-Board expense reimbursement records for 2012, 2013, 2014, 2015 and 2017 which the Treasurer had previously kept at the SPAM offices. The Treasurer reported to PULLMAN that certain expense records were missing. Thereafter, on or about September 27, 2018, while the Treasurer was compiling expense records that were required to be produced pursuant to the grand jury subpoena issued on September 18, 2018, PULLMAN suggested to the

Treasurer that they should falsely tell federal investigators that SPAM had an internal policy to destroy expense reimbursement records after one year.

62.     On or about October 17, 2018, after learning about the federal grand jury investigation into SPAM, and when questioned by federal law enforcement agents, LYNCH falsely denied ever making any payments to either PULLMAN or his spouse from her personal account or from the Lobbying Firm's business account.   When questioned by federal law enforcement agents, LYNCH furthermore denied having any conversations with PULLMAN about the ongoing grand jury investigation.

## COUNT ONE
Racketeering Conspiracy
(18 U.S.C. § 1962(d))

The Grand Jury charges:

63.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 53, and 60 through 62 of this Indictment.

64.     From in or about September 2012 through in or about September 28, 2018, in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

and others known and unknown to the grand jury, being persons employed by and associated with SPAM, which enterprise engaged in, and the activities of which affected interstate commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5); consisting of multiple acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud), Title 18, United States Code, Section 1343 and 1346 (relating to honest services wire fraud), and Title 18, United States Code, Section 1503 (relating to obstruction of justice); and multiple acts involving bribery in violation of Chapter 271 of Massachusetts General Laws, Section 39(a) (relating to state commercial bribery), Chapter 274 of Massachusetts General Laws, Section 6 (relating to state attempt), and Chapter 274 of Massachusetts General Laws, Section 7 (relating to state conspiracy).

65.     It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

### Purposes of the Conspiracy

66.     The principal purposes of the racketeering conspiracy were:

a.      To personally enrich PULLMAN, LYNCH and the Lobbying Firm, and deprive SPAM, the Membership and the Commonwealth of their right to honest services from PULLMAN, through fraud and deceit including PULLMAN's receipt of illegal bribes and kickbacks from LYNCH and the Lobbying Firm;

b.      To fraudulently obtain money and property from SPAM, the Membership, the Commonwealth, and Companies A and B by concealing the payment of bribes and kickbacks from LYNCH and the Lobbying Firm to PULLMAN; and

c.      To obstruct and impede the federal grand jury's investigation of SPAM.

### Manner and Means of the Conspiracy

67.     Among the manners and means by which the defendants and others known and unknown to the Grand Jury carried out the racketeering conspiracy were the following:

a.      In exchange for bribes and kickbacks from LYNCH and the Lobbying Firm, PULLMAN directed companies and individuals seeking support from SPAM to the Lobbying Firm.

b.      PULLMAN and LYNCH defrauded Companies A and B of money and property by causing them to enter into lobbying and consulting contracts with the Lobbying Firm

without disclosing the fact that PULLMAN was receiving bribes and kickbacks from LYNCH and the Lobbying Firm.

    c.  As President of SPAM, PULLMAN sought to protect and increase both his and SPAM's power and authority through the intimidation of others and the obstruction of the federal grand jury investigation into SPAM.

  All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
Racketeering
(18 U.S.C. § 1962(c))

The Grand Jury further charges:

68.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62 of this Indictment.

69.     From in or about 2012 through September 28, 2018, in the District of Massachusetts and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

being persons employed by and associated with SPAM, which enterprise engaged in, and the activities of which, affected, interstate commerce, did unlawfully and knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise, through a pattern of racketeering activity particularly described below in paragraphs 70 through 85.

22

<u>Racketeering Act Number One</u>
Honest Services Wire Fraud, Aiding and Abetting
and Commercial Bribery Related to DOL Settlement
(18 U.S.C. §§ 1343, 1346 and 2; M.G.L. Ch. 271, Sec. 39(a))

70.     The defendants named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act Number One:

<u>Racketeering Act 1A</u>:

71.     On or about November 12, 2014, in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and to deprive SPAM, the Membership and the Commonwealth of their right of honest services of PULLMAN through bribes and kickbacks, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit: the deposit of a $20,000 personal check from LYNCH payable to PULLMAN's spouse, together with associated notices, account updates and acknowledgements, in violation of Title 18, United State Code, Sections 1343, 1346 and 2.

Racketeering Act 1B:

72.     On or about November 12, 2014, in the District of Massachusetts, and elsewhere, the defendant,

DANA A. PULLMAN,

as an agent and fiduciary of SPAM, in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, solicited, accepted, and agreed to accept a $20,000 check from LYNCH, who was not an employee, principal, and beneficiary of SPAM, payable to PULLMAN's spouse, upon an agreement and understanding that such payment would influence PULLMAN's conduct in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

Racketeering Act 1C:

73.     On or about November 12, 2014, in the District of Massachusetts, and elsewhere, the defendant,

ANNE M. LYNCH,

in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, offered, gave, and agreed to give PULLMAN as an agent and fiduciary of SPAM a $20,000 check with the intent to influence PULLMAN's conduct, in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

<u>Racketeering Act Two</u>
Wire Fraud, Aiding and Abetting and
Commercial Bribery Related to Company A
(18 U.S.C. §§ 1343 and 2; M.G.L. Ch. 271, Sec. 39(a))

74.     The defendants named below committed the following acts, any one of which alone

constitutes the commission of Racketeering Act Number Two:

<u>Racketeering Acts 2A through 2D</u>

75.     On or about the dates set forth below, in the District of Massachusetts, and

elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money

and property from Company A by means of materially false and fraudulent pretenses,

representations, and promises, did transmit and cause to be transmitted by means of wire

communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing the scheme to defraud, as set forth below in violation of Title 18,

United State Code, Sections 1343 and 2:

| Racketeering Act | Approximate Date | Description |
|---|---|---|
| 2A | July 26, 2014 | E-mail from PULLMAN at approximately 3:18 p.m. using email account spampresidentdp@gmail.com to Employee A |
| 2B | August 7, 2014 | E-mail from LYNCH at approximately 6:18 p.m. using email account alynch@***************.net to Employee A |
| 2C | August 27, 2014 | Deposit of Check No. 5686, in the amount of $5,000 and drawn on the Lobbying Firm's account into PULLMAN's joint account, together with associated notices, account updates and acknowledgements |

| 2D | September 14, 2014 | $20,000 wire transfer from Company A's account to the Lobbying Firm's account, together with associated notices, account updates and acknowledgements |
|---|---|---|

Racketeering Act 2E

76.     On or about August 27, 2014, in the District of Massachusetts, and elsewhere, the defendant,

DANA A. PULLMAN,

as an agent and fiduciary of SPAM, in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, solicited, accepted, and agreed to accept a $5,000 check from LYNCH and the Lobbying Firm, both of whom were not an employee, principal, and beneficiary of SPAM, upon an agreement and understandings that such payment would influence PULLMAN's conduct in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

Racketeering Act 2F

77.     On or about August 27, 2014, in the District of Massachusetts, and elsewhere, the defendant,

ANNE M. LYNCH,

in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, offered, gave, and agreed to give PULLMAN as an agent and fiduciary of SPAM a $5,000 check with the intent to influence PULLMAN's conduct, in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

Racketeering Act Three
Wire Fraud, Aiding and Abetting and
Commercial Bribery Related to Company B
(18 .S.C. §§ 1343 and 2; M.G.L. Ch. 271, Sec. 39(a))

78.     The defendants named below committed the following acts, any one of which

alone constitutes the commission of Racketeering Act Number Three:

Racketeering Acts 3A and 3B

79.     On or about the dates set forth below, in the District of Massachusetts, and

elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money

and property from Company B by means of materially false and fraudulent pretenses,

representations, and promises, did transmit and cause to be transmitted by means of wire

communications in interstate and foreign commerce, writings, signs, signals, pictures, and

sounds for the purpose of executing the scheme to defraud, as set forth below in violation of Title

18, United State Code, Sections 1343 and 2:

| Racketeering Act | Approximate Date | Description |
| --- | --- | --- |
| 3A | February 11, 2016 | Text message from the Lobbyist to PULLMAN at phone number (***) ***-6696 at approximately 5:26 p.m. |
| 3B | February 22, 2016 | Deposit of Check No. 3646, in the amount of $5,000 and drawn on LYNCH's account into PULLMAN's joint account, together with associated notices, account updates and acknowledgements. |

### Racketeering Act 3C

80.   On or about February 22, 2016, in the District of Massachusetts, and elsewhere, the defendant,

### DANA A. PULLMAN,

as an agent and fiduciary of SPAM, in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, solicited, accepted, and agreed to accept a $5,000 check from LYNCH, who was not an employee, principal, and beneficiary of SPAM, upon an agreement and understandings that such payment would influence PULLMAN's conduct in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

### Racketeering Act 3D

81.   On or about February 22, 2016, in the District of Massachusetts, and elsewhere, the defendant,

### ANNE M. LYNCH,

in relation to a transaction and matter concerning the business affairs of an employer, principal, and beneficiary, to wit SPAM, offered, gave, and agreed to give PULLMAN as an agent and fiduciary of SPAM a $5,000 check with the intent to influence PULLMAN's conduct, in violation of Section 39(a), Chapter 271 of Massachusetts General Laws.

Racketeering Act Four
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

82.    The defendant named below committed the following acts, any one of which alone constitutes the commission of Racketeering Act Number Four:

Racketeering Acts 4A and 4B

83.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

DANA A. PULLMAN,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property from SPAM and the Membership by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below in violation of Title 18, United State Code, Sections 1343 and 2:

| Racketeering Act | Approximate Date | Description |
|---|---|---|
| 4A | October 18, 2016 | Payment of approximately $468 at Marea restaurant in New York, NY using debit card number ***********0627 issued by Eastern Bank for SPAM account number *5288, together with associated notices, account updates and acknowledgements. |
| 4B | March 1, 2017 | Payment of approximately $2,113.70 at the Palms Hotel, Miami Beach, FL using debit card number ***********0627 issued by Eastern Bank for SPAM account number *5288, together with associated notices, account updates and acknowledgements. |

<u>Racketeering Act Five</u>
Obstruction of Justice; Aiding and Abetting
(18 U.S.C. §§ 1503(a) and 2)

84.     In or about and between September 2018 and October 2018, in the District of

Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the

due administration of justice in the grand jury investigation of SPAM and others by, among other

things, attempting to manipulate records required to be produced pursuant to a grand jury

subpoenas in violation of Title 18, United States Code, Sections 1503(a) and 2.

Racketeering Act Six
Obstruction of Justice
(18 U.S.C. § 1503(a))

85.     On or about October 17, 2018, in the District of Massachusetts, and elsewhere,

the defendant,

ANNE M. LYNCH,

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the

due administration of justice in the grand jury investigation of SPAM and others by, among other

things, falsely denying to Special Agents of the FBI and IRS that she ever made any payments to

either PULLMAN or his spouse from LYNCH's personal account or from the Lobbying Firm's

business account and by falsely denying she had ever had any conversations with PULLMAN

about the ongoing grand jury investigation, in violation of Title 18, United States Code, Section

1503(a).

All in violation of Title 18, United States Code, Section 1962(c).

## COUNT THREE
Conspiracy to Commit Honest Services Wire Fraud and Wire Fraud
(18 U.S.C. § 1349)

86.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 53, and 66 and 67 of this Indictment.

87.     From in or about 2012 through on or about September 28, 2018 in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

together with others known and unknown to the Grand Jury, conspired to commit wire fraud and honest services wire fraud that is, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property to wit, money and other things of value from SPAM, the Membership and vendors having business with SPAM, by means of materially false and fraudulent pretenses, representations and promises, and to defraud and deprive, variously, SPAM, the Membership and the Commonwealth of their right to the honest and faithful services of PULLMAN, through bribes and kickbacks, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Sections 1343, 1346 and 1349.

32

## COUNT FOUR
Honest Services Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343, 1346 and 2)

88.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 37, of this Indictment.

89.     On or about November 12, 2014, in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and to deprive SPAM, the Membership and the Commonwealth of their right of honest services of PULLMAN through bribes and kickbacks, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit: the deposit of a $20,000 personal check from LYNCH payable to PULLMAN's spouse, together with associated notices, account updates and acknowledgements.

All in violation of Title 18, United State Code, Sections 1343, 1346 and 2.

33

## COUNT FIVE
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

90.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25, and 38 through 47 of this Indictment.

91.     On or about September 14, 2014, in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property from Company A by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, to wit: the wire transfer of $20,000 from Company A's account to the Lobbying Firm's account, together with associated notices, account updates and acknowledgements.

All in violation of Title 18, United State Code, Sections 1343 and 2.

## COUNTS SIX AND SEVEN
Wire Fraud; Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

92.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25, and 48 through 53 of this Indictment.

93.     On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property from Company B by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|---|---|---|
| 6 | February 11, 2016 | Text message from the Lobbyist to PULLMAN at phone number (***) ***-6696 at approximately 5:26 p.m. |
| 7 | February 22, 2016 | Deposit of Check No. 3646, in the amount of $5,000 and drawn on LYNCH's account into PULLMAN's joint account, together with associated notices, account updates and acknowledgements. |

All in violation of Title 18, United State Code, Sections 1343 and 2.

35

## COUNTS EIGHT AND NINE
### Wire Fraud; Aiding and Abetting
### (18 U.S.C. §§ 1343 and 2)

94.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25, and 54 through 59 of this Indictment.

95.     On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

## DANA A. PULLMAN,

having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property from SPAM and the Membership by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme to defraud, as set forth below:

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 8 | October 18, 2016 | Payment of approximately $468 at Marea restaurant in New York, NY using debit card number ***********0627 issued by Eastern Bank for SPAM account number *5288, together with associated notices, account updates and acknowledgements. |
| 9 | March 1, 2017 | Payment of approximately $2,113.70 at the Palms Hotel, Miami Beach, FL using debit card number ***********0627 issued by Eastern Bank for SPAM account number *5288, together with associated notices, account updates and acknowledgements. |

All in violation of Title 18, United State Code, Sections 1343 and 2.

## COUNT TEN
Obstruction of Justice; Aiding and Abetting
(18 U.S.C. §§ 1503(a) and 2)

97.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25, and 60 and 61 of this Indictment.

98.     In or about and between September 2018 and October 2018, in the District of Massachusetts and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due administration of justice in the grand jury investigation of SPAM and others by, among other things, attempting to manipulate records required to be produced pursuant to a grand jury subpoenas.

All in violation of Title 18, United States Code, Sections 1503(a) and 2.

COUNT ELEVEN
Obstruction of Justice
(18 U.S.C. § 1503(a))

99.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 25, and 62 of this Indictment.

100.    On or about October 17, 2018, in the District of Massachusetts and elsewhere, the defendant,

ANNE M. LYNCH,

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due administration of justice in the grand jury investigation of SPAM and others by, among other things, falsely denying to Special Agents of the FBI and IRS that she ever made any payments to either PULLMAN or his spouse from LYNCH's personal account or from the Lobbying Firm's business account and by falsely denying she had ever had any conversations with PULLMAN about the ongoing grand jury investigation.

All in violation of Title 18, United States Code, Section 1503(a).

## COUNT TWELVE
Conspiracy to Defraud the United States
(18 U.S.C. § 371)

101.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62

of this Indictment.

102.    From at least in or about August 2014 through in or about September 2018, in the

District of Massachusetts and elsewhere, the defendants,

DANA A. PULLMAN and
ANNE M. LYNCH,

did conspire with each other and others known and unknown to the Grand Jury to defraud the

United States for the purpose of impeding, impairing, obstructing, and defeating the lawful

government functions of the U.S. Treasury Department and the IRS in the ascertainment,

computation, assessment, and collection of revenue: to wit, federal income taxes.

### Objective of the Conspiracy

103.    The principal purpose of the conspiracy was to conceal illegal bribes, kickbacks

and other payments from LYNCH and the Lobbying Firm to PULLMAN in a manner designed

to avoid reporting and paying the taxes due and owing on that income to the IRS.

### Manner and Means of the Conspiracy

104.    Among the manner and means by which PULLMAN, LYNCH, and

coconspirators known and unknown to the Grand Jury carried out the conspiracy and the scheme

to defraud were the following:

a.      PULLMAN and LYNCH disguised illegal bribe and kickback payments

from LYNCH and the Lobbying Firm to PULLMAN as consulting or commission fees and as

payments to PULLMAN's spouse.

      b.     In connection with the issuance of checks to PULLMAN for illegal bribes kickbacks and other payments, LYNCH caused the Lobbying Firm's accounting records to falsely indicate that the payments to either PULLMAN or his spouse were either commission payments or consulting fees.

      c.     LYNCH failed to issue and caused the Lobbying Firm to fail to issue IRS Forms 1099-MISC to PULLMAN and his spouse for the payments LYNCH and the Lobbying Firm made to them in 2014 and 2016.  Employers and payers are required to prepare and submit Forms 1099-MISC, "Miscellaneous Income," annually with the IRS to report amounts paid to persons who are not employees, and to give the Forms 1099-MISC to such persons for preparation of their individual tax returns.

      d.     LYNCH caused the Lobbying Firm to file IRS Forms 1120S for the tax years 2013, 2014, 2015 and 2016 which falsely characterized the payments to PULLMAN and his spouse as consulting or commission payments, when in fact the payments constituted bribes and kickbacks.

      e.     For the tax year 2014, PULLMAN and his spouse purposely failed to report a total of at least $25,000 in income to the IRS on their joint personal return, IRS Form 1040.

      f.     For the tax year 2015, LYNCH purposely failed to report her receipt of approximately $30,000 of income to the IRS on her IRS Form 1040, income derived from funds falsely characterized on the Lynch Associates corporate books as a $50,000 payment to

PULLMAN's spouse for a "consulting fee."

g.      For the tax year 2016, PULLMAN and his spouse purposely failed to report a total of approximately $16,250 in income from the IRS.

### Overt Acts in Furtherance of the Conspiracy

105.    In furtherance of the conspiracy to defraud, the following overt acts, among others, were committed in the District of Massachusetts, and elsewhere:

#### *Tax Year 2014*

106.    On or about August 20, 2014, the Lobbying Firm issued a $5,000 check payable to PULLMAN.  The $5,000 check was drawn from the Lobbying Firm's business account, described in the Lobbying Firm's records as a "commission expense," and was in connection with the Lobbying Firm's $20,000 contract with Company A.

107.    On or about August 27, 2014, the $5,000 check from the Lobbying Firm was deposited into PULLMAN's joint personal bank account with his spouse.

108.    On or about November 6, 2014, PULLMAN transferred approximately $250,000 from SPAM to the Lobbying Firm via a check payable to the Lobbying Firm that was deposited into the Lobbying Firm's business account. The $250,000 check was in connection with the $350,000 cost reimbursement that SPAM received from the Commonwealth as part of the DOL Settlement.

109.    On or about November 10, 2014, LYNCH wrote a $50,000 check payable to herself from the Lobbying Firm's business account originally described on the Lobbying Firm's records as an "Owner's Draw."

110.    After depositing the check into her personal account on or about November 11,

2014, LYNCH wrote a check for $20,000 from her personal account payable to PULLMAN's

spouse.

111.    On or about November 12, 2014, the $20,000 check from LYNCH was deposited

into PULLMAN's joint personal bank account with his spouse.

112.    On or about March 9, 2015, PULLMAN and his spouse filed a joint federal

income tax return, IRS Form 1040 for the tax year 2014 which purposely omitted the $25,000 in

checks that PULLMAN and his spouse received from LYNCH and the Lobbying Firm in 2014.

113.    Thereafter, between September 2015 and November 2015, following an inquiry

from the Lobbying Firm's accounting firm to the Lobbyist, the classification of LYNCH's

$50,000 check to herself as an "Owner's Draw" was changed to a $50,000 payment to

PULLMAN's spouse for a "consulting fee" on the Lobbying Firm's records, even though neither

PULLMAN nor his spouse ever did any consulting work for the Lobbying Firm, and the

payment to PULLMAN's spouse was $20,000 and not $50,000.

114.    On or about December 15, 2014, the Lobbying Firm filed an IRS Form 1120S for

the tax period October 1, 2013 through September 30, 2014 which falsely characterized the

August 27, 2014 payment of $5,000 to PULLMAN as a commission expense, when in fact the

payment constituted a bribe and kickback.

115.    On or about December 15, 2015, the Lobbying Firm filed an IRS Form 1120S for

the tax period October 1, 2014 through September 30, 2015 which falsely characterized the

November 10, 2014 payment of $50,000 to LYNCH (of which LYNCH kept $30,000 and gave

PULLMAN and his spouse $20,000) as a consulting expense, when in fact the payment constituted an owner's draw to LYNCH, and a bribe and kickback to PULLMAN.

116.     On or about January 1, 2016, LYNCH filed an individual federal income tax return, IRS Form 1040 for the tax year 2015 which purposely omitted her receipt of any portion of the $50,000 "Owner's Draw" from November 2014.

*Tax Year 2016*

117.     On or about February 15, 2016, LYNCH wrote a $5,000 check from the Lobbying Firm's business account that was characterized on the firm's records as a payment to "Boston Consulting Group" for a "consulting fee." In fact, LYNCH made the $5,000 check payable herself and deposited the check into her personal account on or about February 19, 2016.

118.     On or about February 22, 2016, LYNCH wrote a check for $5,000 from her personal account payable to PULLMAN.

119.     On or about February 22, 2016, the $5,000 check from LYNCH was deposited into PULLMAN's joint personal checking account with his spouse.

120.     On or about October 25, 2016, SPAM Attorney #2 entered into a written contract with the Lobbying Firm and agreed to pay the Lobbying Firm $7,500 a month to assist SPAM Attorney #2 in applying for and obtaining a marijuana license with the Commonwealth. Pursuant to the contract, on or about November 28, 2016, SPAM Attorney #2 paid the Lobbying Firm a total of $22,500 for the initial three-month period of the contract.

121.     On or about November 29, 2016, PULLMAN and LYNCH participated in a meeting with SPAM Attorney #2 and the Lobbyist about SPAM Attorney #2's potential

marijuana business. The same day, the Lobbyist issued a $2,250 check payable to PULLMAN's spouse from the Lobbying Firm's business account. The check was classified on the Lobbying Firm's records as a "consulting fee," even though neither PULLMAN nor his spouse ever did any consulting work for the Lobbying Firm. Instead, the $2,250 was intended for PULLMAN's benefit and was in connection with PULLMAN's involvement in facilitating the business relationship between the Lobbying Firm and SPAM Attorney #2.

122.   The $2,250 check was deposited into PULLMAN's joint personal checking account with his spouse on or about December 2, 2016.

123.   On or about December 14, 2016, SPAM Attorney #2 paid the Lobbying Firm $90,000.00 as an advance on its contract. On or about December 16, 2016, PULLMAN, SPAM Attorney #2 and the Lobbyist viewed a potential site location for SPAM Attorney #1's marijuana business. After the meeting, the Lobbyist sent an email to SPAM Attorney #2 about the meeting, suggested a follow up meeting, and forwarded the email to PULLMAN and wrote, *"thank you for coming out today, I appreciate it."*

124.   On or about December 22, 2016, during a series of text messages, the Lobbyist arranged to deliver a $9,000 check payable to PULLMAN's spouse from the firm's business account. The $9,000 payment was characterized on the Lobbying's Firm's records as a "consulting fee" even though neither PULLMAN nor his spouse ever did any consulting work for the Lobbying Firm. Instead, the $9,000 was intended for PULLMAN's benefit and was in connection with PULLMAN's involvement in facilitating the business relationship between the Lobbying Firm and SPAM Attorney #2.

44

125.    On or about December 28, 2016, the $9,000 check was deposited into PULLMAN's joint personal checking account with his spouse.

126.    On or about December 15, 2016, the Lobbying Firm filed an IRS Form 1120S for the tax period October 1, 2015 through September 30, 2016 which falsely characterized the February 15, 2016 payment of $5,000 to LYNCH (which LYNCH deposited into her personal account and then used to pay PULLMAN $5,000) as a consulting expense, when in fact PULLMAN never performed any type of consulting work for the Lobbying Firm.

127.    On or about March 9, 2018, the Lobbying Firm filed an IRS Form 1120S for the tax period October 1, 2016 through September 30, 2017 which falsely characterized the December 2, 2016 payment of $2,250 and December 22, 2016 payment of $9,000 to PULLMAN's spouse as consulting expenses, when in fact PULLMAN's spouse never performed any type of consulting work for the Lobbying Firm.

128.    On or about March 27, 2017, PULLMAN and his spouse filed a joint federal income tax return, IRS Form 1040 for the tax year 2016 which purposely omitted the $16,250 in checks that PULLMAN and his spouse received from LYNCH and the Lobbying Firm in 2016.

All in violation of Title 18, United States Code, Section 371.

## COUNTS THIRTEEN AND FOURTEEN
### Aiding and Assisting the Filing of a False Tax Return
(26 U.S.C. § 7206(2))

129.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62, 66, 67, and 103 through 128 of this Indictment.

130.    On or about the dates set forth below, in the District of Massachusetts, and elsewhere, the defendant,

### DANA A. PULLMAN,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of joint U.S. Individual Income Tax Returns, Forms 1040, of defendant PULLMAN and his spouse, for the calendar years specified below. The tax returns were false and fraudulent as to material matters, in that the said returns, among other false items, understated other income and total income, as further specified below; whereas, as defendant PULLMAN then and there knew, he received materially more other income and total income, than defendant PULLMAN caused to be disclosed and reported on Forms 1040:

| Count | Tax Return | Tax Period | Date Filed (Approx.) | False Item(s) |
|-------|-----------|------------|----------------------|---------------|
| 13 | Form 1040 | 2014 | March 9, 2015 | a. Line 21: other income, $0<br>b. Line 22: total income, $194,990 |
| 14 | Form 1040 | 2016 | March 27, 2016 | a. Line 21: other income, $0<br>b. Line 22: total income, $200,589 |

All in violation of Title 26, United States Code, Section 7206(2).

COUNTS FIFTEEN THROUGH EIGHTEEN
Aiding and Assisting the Filing of a False Tax Return
(26 U.S.C. § 7206(2))

131.     The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 62,

66, 67, and 103 through 130 of this Indictment.

132.     On or about the dates set forth below, in the District of Massachusetts, and

elsewhere, the defendant,

ANNE M. LYNCH,

did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation

to the Internal Revenue Service, of U.S. Income Tax Returns for an S Corporation, Forms 1120S,

of the Lobbying Firm, for the tax years specified below.  The tax returns were false and

fraudulent as to material matters, in that the said returns, among other false items, overstated the

Lobbying Firm's expenses and deductions, and understated its ordinary business income as

further specified below, whereas, as defendant LYNCH then and there knew, the Lobbying Firm

had materially less expenses and deductions, and more ordinary business income than was

reported on Forms 1120S:

| Count | Tax Return | Tax Period | Date Filed (Approx.) | False Item(s) |
|-------|-----------|-----------|---------------------|---------------|
| 15 | Form 1120S | October 1, 2013 – September 30, 2014 | December 15, 2014 | a. Line 20: total deductions, $1,211,492 b. Line 21: ordinary business income (loss), $51,816 |
| 16 | Form 1120S | October 1, 2014 – September 30, 2015 | December 15, 2015 | a. Line 20: total deductions, $1,435,998 b. Line 21: ordinary business income (loss), $68,636 |

47

| 17 | Form 1120S | October 1, 2015 – September 30, 2016 | December 15, 2016 | a. Line 20: total deductions, $1,387,800<br>b. Line 21: ordinary business income (loss), $61,849 |
| 18 | Form 1120S | October 1, 2016 – September 30, 2017 | March 9, 2018 | a. Line 20: total deductions, $1,613,841<br>b. Line 21: ordinary business income (loss), $52,577 |

All in violation of Title 26, United States Code, Section 7206(2).

## RICO FORFEITURE ALLEGATION
### (18 U.S.C. § 1963(a))

135.    Upon conviction of one or more of the offenses in violation of Title 18, United

States Code, Section 1962, set forth in Counts One and Two of this Indictment,

DANA A. PULLMAN and<br/>ANNE M. LYNCH,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code,

Section 1963:

a.    any interest acquired or maintained in violation of Title 18, United States Code, Section 1962;

b.    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and

c.    any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

The property to be forfeited includes, but is not limited to, a forfeiture money judgment.

136.    If any of the property described in Paragraph 137, above, as being forfeitable

pursuant to Title 18, United States Code, Section 1963(a), as a result of any act or omission of

the defendants –

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the property described in Paragraph 137 above.

All pursuant to Title 18, United States Code, Section 1963(a).

## FRAUD FORFEITURE ALLEGATIONS
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

137.    Upon conviction of one or more of the offenses in violation of violation Title 18, United States Code, Sections 1341, 1343, 1346, and 1349 set forth in Counts Three through Eleven of this Indictment,

DANA A. PULLMAN and
ANNE M. LYNCH,

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.  The property to be forfeited includes, but is not limited to, a forfeiture money judgment.

138.    If any of the property described in Paragraph 139, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendants --

  a.   cannot be located upon the exercise of due diligence;

  b.   has been transferred or sold to, or deposited with, a third party;

  c.   has been placed beyond the jurisdiction of the Court;

  d.   has been substantially diminished in value; or

  e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 139 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

Kristina E. Barclay
Neil J. Gallagher, Jr.
Assistant United States Attorneys
District Of Massachusetts

District of Massachusetts: September _12_, 2019
Returned into the District Court by the Grand Jurors and filed.

DEPUTY CLERK

9-12-19

2:45 pm

52