UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
v.                             )          Criminal No. 19-10345-DPW
                               )
DANA A. PULLMAN, and           )
ANNIE M. LYNCH                 )

## **MOTION TO DISMISS COUNTS AS TO DANA A. PULLMAN**

Defendant, Dana A. Pullman, moves this Court for an order dismissing Counts Three through Seven. Regarding these counts, the indictment does not fully, directly, and expressly, without any uncertainty or ambiguity, set forth the elements of these offenses and, therefore, each of the counts fails to state an offense. Dismissal of Counts Three through Seven also requires dismissal of racketeering acts 1 through 3 within the racketeering allegation at Count Two. Finally, reference to any violation of the Massachusetts commercial bribery statute should be stricken from Count One.

## **Factual and Procedural History[1]**

An 18-count indictment accuses Mr. Pullman and Anne M. Lynch of committing a series of crimes that the government says occurred between September 2012 and September 2018. Thirteen of the counts pertain to Mr. Pullman. (D.E. 17, indictment (Exh. A), at Counts 1-10 and 12-14.)

Mr. Pullman served for over three decades as a trooper for the

---

[1] Even though Mr. Pullman disagrees with some of the facts asserted in the indictment, he relies upon them as true for the purposes of this motion. Mr. Pullman does not recite every fact alleged in the indictment.

Massachusetts State Police (MSP). (D.E. 17 at 5.) Over those thirty years, he served first as a member, then as the treasurer, and finally as the president of the State Police Association of Massachusetts (SPAM).

Ms. Lynch founded a lobbying firm in 2001, and she and the firm lobbied and advocated on MSP's and SPAM's behalf. (D.E. 17 at 6.) She and Mr. Pullman are friends. (D.E. 17 at 6.) Both are politically active on matters concerning law enforcement.

As explained below, the indictment centers around three alleged schemes: one involving the negotiation of SPAM's days-off-lost (DOL) grievance against MSP and the Commonwealth; one involving conduct associated with Employee A and Company A (a software company); and one involving conduct associated with Employee B and Company B (a smart weapons company).

**The DOL grievance and settlement.** Around 2005, SPAM filed a grievance with the MSP on behalf of SPAM's membership. (D.E. 17 at 8.) The grievance alleged that the MSP had not properly paid employees who worked on days scheduled off. The grievance became known as the days-off-lost grievance. The DOL sought proper compensation from the MSP, through the Commonwealth of Massachusetts, for the past hours worked. To support the grievance, SPAM incurred costs including costs associated with office space, temporary employees, and work performed by the lobbying firm. These costs were necessary for, among other things, calculating the total amount of days-off-lost by MSP employees.

In about July 2013 a tentative agreement was reached in the DOL

grievance. (D.E. 17 at 8.) Around August of 2014, SPAM and the Commonwealth reached a 22-million-dollar final settlement. The details of the final settlement were negotiated by Mr. Pullman, Ms. Lynch, another lobbyist from the lobbying firm, MSP, and the Commonwealth. (D.E. 17 at 8-9.) Negotiations suggested that SPAM had spent approximately $700,000 prosecuting the grievance. (D.E. 17 at 9.) The final settlement required the Commonwealth to pay SPAM $350,000 for costs.

Between June 2013 and February 2014—before the final DOL settlement had been reached—SPAM had paid the lobbying firm a total of $100,000 for DOL grievance work. On about November 5, 2014—after SPAM received the $350,000 payment from the Commonwealth—SPAM paid the lobbying firm $250,000 for work done on the DOL project. On about November 10, 2014, Ms. Lynch wrote a $50,000 check to herself using the lobbying firm's bank account. The next day, Ms. Lynch wrote a $20,000 check to Mr. Pullman's spouse; that check was later deposited into the Pullmans' joint account.

**Company A.** About March 2014, a member of MSP involved in law enforcement technology, encouraged an employee for Company A to make a presentation to Mr. Pullman concerning Company A's products. (D.E. 17 at 11.) Company A was a New York company developing and marketing computer software to law enforcement agencies. About July 25, 2014, employee A gave Mr. Pullman and SPAM's treasurer a demonstration on Company A's products. Thereafter, Mr. Pullman encouraged Employee A to hire Ms. Lynch and her lobbying firm to help the company prepare and submit a response to the

3

Commonwealth's request for proposal. The next day, Mr. Pullman e-mailed employee A saying Ms. Lynch was "a true expert in the state of Mass procurement process."

Ms. Lynch and Employee A met, and thereafter the lobbying firm and Company A entered into an agreement wherein Company A would pay the lobbying firm $20,000 for professional services. (D.E. 17 at 12.) About September 14, 2014, Company A paid the lobbying firm the agreed upon $20,000 using a wire transfer. Before that payment—on about August 20, 2014—the lobbying firm issued a $5,000 check to Mr. Pullman which was later deposited into the Pullmans' joint account. (D.E. at 12.)

**Company B.** About April 2015, Employee B attempted to market and sell smart weapons to the MSP and the Massachusetts DOC. (D.E. 17 at 13.) Company B was an Arizona based company that sold smart weapons to law enforcement agencies. About April 9, 2015, Employee B met with Mr. Pullman and SPAM's treasurer to discuss the possibility of Company B contracting to sell smart weapons to the MSP. Mr. Pullman suggested Company B hire Ms. Lynch and the lobbying firm to assist with the process. Company B already had a Boston area lobbying firm on retainer. Employee B believed that Company B would not be able to sell smart weapons to MSP without hiring Ms. Lynch and her lobbying firm. Between about October 2015 and May 2016, Company B paid the lobbying firm a total of $138,000 for services.

Company B also made efforts to sell smart weapons to the DOC. (D.E. 17 at 14.) Mr. Pullman arranged a meeting between Employee B and the

Undersecretary of Criminal Justice about the possible sale of smart weapons to the DOC. The meeting occurred about February 11, 2016. After the meeting, Employee B text messaged Mr. Pullman thanking him. On about February 22, 2016, Ms. Lynch paid Mr. Pullman $5,000.

Based on these facts and others, the government has charged Mr. Pullman with: Racketeering Conspiracy (Count One); Racketeering (Count Two); Honest Services Wire Fraud Conspiracy (Count Three); Honest Services Wire Fraud (Count Four); Wire Fraud (Counts Five, Six, and Seven); Wire Fraud (Counts Eight and Nine); Obstruction of Justice (Count Ten); Conspiracy to Defraud the United States (Count Twelve); and Tax Return Violations (Counts Thirteen and Fourteen).

With this motion, Mr. Pullman moves to dismiss Counts Three through Seven. He also moves to dismiss racketeering acts one through three located in Count Two. Finally, he moves to strike reference in Count One to the Massachusetts commercial bribery statute.

## **Argument**

The Fifth Amendment requires a defendant be indicted by a grand jury before being held to answer for a criminal charge. The Sixth Amendment requires the defendant be informed of the nature and cause of the accusation. United States v. Stepanets, 879 F.3d 367, 372 (2018). These two constitutionally grounded rules coalesce in Rule 7(c)(1). That rule says, "The indictment or information must be a plain, concise, and definite written statement" of the offense charged. Fed. R. Crim. P. 7(c)(1).

An indictment must, first, provide the elements of the offense charged and fairly inform the defendant of the charge against which he must defend, and second, enable the defendant to plead an acquittal or argue double jeopardy in any future prosecutions. Hamling v. United States, 418 U.S. 87, 117 (1974); United States v. Gurrier, 699 F.3d 1, 4 (1st Cir. 2011). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth the elements necessary to constitute an offense intended to be punished.'" Id. (citing and quoting United States v. Carll, 105 U.S. 611, 612, 26 L.Ed. 1135 (1882)); United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010).

## I.   The wire fraud and honest services wire fraud allegations in Counts Four through Seven should be dismissed for failure to state an offense.

Mr. Pullman finds that the indictment does not fully, directly, and expressly, without any uncertainty or ambiguity, set forth the necessary elements and fails to inform him of the offenses against which he must defend.

### A. The history of the wire fraud and honest services wire fraud statutes.

The hazy contours of the wire fraud and honest services wire fraud offenses are drawn by a series of statutes and interpretive court opinions. 18 U.S.C. § 1341 defines mail fraud, while § 1343 defines wire fraud. Except that one section involves the use of mail, while the other involves the use of wires, the statutes are nearly mirror images of each other so that cases interpreting

one will be said to interpret the other.[2] Mr. Pullman will refer to the two sections together as "the fraud statutes."

The text of the fraud statutes have—since Congress enacted an amendment in 1909—prohibited fraudulent schemes meant to obtain money or property. Despite the textual limitation to "money or property," many lower federal courts had, decades ago, decided the statutes also covered deprivations of intangible rights like honest services.[3]

In McNally, the Supreme Court ended the practice of applying the fraud statutes to intangible rights like honest services.[4] The Supreme Court thought the application of the fraud statutes to honest services would "leave [the statutes'] outer boundaries ambiguous and involve [] the Federal Government in setting standards of disclosure and good government for local and state officials."[5] So, with McNally, the Supreme Court told Congress "to speak more clearly than it ha[d]" if it wished to prohibit schemes touching on the deprivation of honest services.

Congress did speak in response to McNally. The following year, Congress enacted 18 U.S.C. § 1346 which says, "The term 'scheme or artifice to defraud'

---

[2] Pasquantino v. United States, 544 U.S. 349, 355 n.2 (2005) ("[W]e have construed identical language in the wire and mail fraud statutes *in pari materia*.")

[3] See United States v. Silvano, 812 F.2d 754, 759 (1st Cir. 1987) ("At least four other courts of appeals have held that the mail fraud statute proscribes use of the United States mails in furtherance of schemes to defraud citizens of their intangible rights[.]"); See also United States v. McNeive, 536 F.2d 1245, 1249 (8th Cir. 1976) (acknowledging that an "increasing number of courts" had endorsed the application of the mail fraud statute to schemes "which operate to deprive individuals of intangible rights or interests").

[4] McNally v. United States, 483 U.S. 350 (1987), *superseded by statute on other grounds as stated in* Skilling v. United States, 561 U.S. 358 (2010)

[5] McNally, 483 U.S. at 360.

includes a scheme or artifice to deprive another of the intangible right to honest services." Congress said just that, and not a word more.

Understandably, lower courts struggled to define the outer confines of Congress's amorphous response to <u>McNally</u>.[6] After some period of struggle by lower courts, the Supreme Court heard <u>Skilling</u>, which considered whether honest services fraud under § 1346 was unconstitutionally vague. The Court "acknowledged that Skilling's vagueness challenge had force," and that honest services decisions were not "models of clarity or consistency."[7] Ultimately the Court decided that only honest service fraud crimes involving illegal bribes or kickbacks could survive constitutional scrutiny.[8] Other iterations of the crime such as allegations of self-dealing—"*i.e.*, the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty"—were counted within the amorphous category of cases determined unconstitutionally vague.

**B. The elements of wire fraud and honest services wire fraud.**

As shown above, the texts of the fraud statutes do not set out the elements of the offenses. For instance, the texts say nothing of bribes or kickbacks, but <u>Skilling</u> inserted these elements to rescue the honest services

---

[6] <u>See</u> <u>e.g.</u>, <u>Skilling</u>, 561 U.S. at 403 ("Alert to § 1346's potential breadth, the Courts of Appeals have divided on how best to interpret that statute."); at 417-422 & n.2 (Scalia, J., concurring) (providing an in-depth discussion of lower court's conflicting interpretations of § 1346 and explaining how that history showed the statute suffered "fundamental indeterminacy" enough to render it unconstitutionally vague).
[7] <u>Skilling</u>, 561 U.S. at 405.
[8] <u>Skilling</u>, 561 U.S. at 404.

fraud statute from being declared unconstitutionally vague. Similarly, the texts say nothing about materiality, but the Supreme Court inserted that element in Neder v. United States, 527 U.S. 1, 25 (1999), where it held that "materiality of falsehood" was required for the fraud statutes. Consequently, an indictment that recounts the statutory text will not necessarily place defendants on sufficient notice. Rather than relying on statutory text, courts have pieced the offense elements together by looking at disparate case law. See United States v. Lusk, 2017 WL 508589 at *5 (S.D.W. Va. Feb. 7, 2017) (collecting cases).

Once collected, the elements of wire fraud require the government to at least allege (1) a scheme or artifice to defraud, (2) that the object of the scheme was the victim's loss, and (3) materiality. Honest services wire fraud requires these same elements, plus two additional elements: (4) a *quid pro quo*, and (5) a fiduciary duty. The amorphous nature of the fraud statutes taken together with the serious questions raised by courts concerning whether the statutes place defendants on sufficient notice converge in this case in way as to warrant a rigorous and detailed assessment of whether the indictment is adequate. See United States v. Tomasetta, 429 F.2d 978, 979 (1st Cir. 1970) ("[W]hat is a fair description of a crime for purposes of permitting an adequate defense necessarily varies with the nature of the offense and the peculiarities of defending against the kind of charge involved.")

### C. Counts Four through Seven do not allege a scheme or artifice to defraud.

The government must allege a scheme or artifice to defraud the victim of money, property, or honest services. The indictment alleges that Mr. Pullman

did not disclose to SPAM, SPAM's membership, and the Commonwealth that he received money payments from Ms. Lynch. But, one who deceives (by failing to disclose) does not necessarily defraud. See United States v. Takhalov, 827 F.3d 1307, 1315-16 (11th Cir. 2016) (reversing wire fraud convictions for failing to give defendant's proposed jury instruction that said, "Failure to disclose the financial arrangement [], in and of itself, is not sufficient to convict …"); United States v. Shellef, 507 F.3d 82,108 (2d Cir. 2007) (explaining the distinction between transactions that deceive and those that defraud); United States v. Starr, 816 F.3d 94, 98 (2d Cir. 1987) (same). The indictment here does not allege a scheme or artifice to defraud, but at most one meant to deceive by non-disclosure. Consequently, Counts Four through Seven should be dismissed.

Moreover, regarding Count Five, the indictment fails to allege a false statement, let-alone a false statement that defrauds rather than deceives. Count Five involves Mr. Pullman's conduct with Company A, a computer software company. (D.E. 17 at ¶38.) The indictment alleges that Mr. Pullman made representations relative to Ms. Lynch's lobbying firm's expertise in contract procurement. (D.E. 17 at ¶42.) However, the indictment does not allege that those representations were false, let-alone that the statements were fraudulent. See United States v. Pearlstein, 576 F.2d 531, 541 & n.3 (3d Cir. 1978) (noting that saying a company was "nationally known" and that it made "among the finest writing instruments in the world" was mere sales "puffing" and not cognizable under the mail fraud statute).

Therefore, Counts Four through Seven fail to allege an offense because

non-disclosure does not allege a scheme to defraud.

### D. Counts Four and Five do not allege that the object of the scheme was the victim's loss.

Not only does a wire fraud allegation require that the scheme be one to defraud, but the victim's loss must be the *object* of the scheme rather than a *byproduct* of it. Kelly v. United States, 140 S. Ct. 1565, 1573 & n.2 (2020) (citing United States v. Walters, 997 F.2d 1219, 1224 (7th Cir. 1993)).

With regard to the honest services fraud allegation in Count Four, the indictment alleges that Mr. Pullman negotiated the DOL settlement on behalf of SPAM and its membership against the Commonwealth and that he received a $20,000 payment from Ms. Lynch afterwards. (D.E. 17 at ¶¶26-37.) However, the indictment does not allege facts suggesting that Mr. Pullman's object was to deprive anyone of his honest services. For instance, the indictment does not allege that Ms. Lynch's lobbying firm had not worked on the DOL settlement and, therefore, was not due payment. Nor does it allege that the lobbying firm did less work than it should have, or that it did such shoddy work as to not warrant the payment made to it by SPAM. Otherwise said, there is no suggestion that Mr. Pullman object was to negotiate the DOL settlement to the lobbying firm's benefit and to SPAM's detriment thereby depriving SPAM of his honest services.[9]

What the indictment seems to allege is an object to gain monetarily. Alleging an object to realize monetary gain does not also allege an objective to

---

[9] The indictment does confirm that the lobbying firm worked on SPAM's behalf since 2008 and that it did so regarding the DOL settlement. (D.E. 17 at ¶11, ¶27.)

deprive one of honest services. See Unites States v. Sawyer, 85 F.3d 713, 725 (1996) ("The broad scope of the mail fraud statute, however, does not encompass every instance of official misconduct that results in the official's personal gain) (citing United States v. Silvano, 812 F.2d 754, 760 (1st Cir. 1987). One could gain monetarily and still render honest services. See Sawyer, 85 F.3d at 741 (reversing an honest services fraud conviction and distinguishing between unattractive conduct and an unlawful bribe); United States v. Woodward, 149 F.3d 46, 69 (1st Cir. 1998) (a conviction in a "dual intent" case will be upheld provided a criminal objective is proved "in addition to" any other objectives alleged). As a result, Count Four should be dismissed for failing to allege that Mr. Pullman's object was to deprive others of his honest services.

The money and property wire fraud allegation in Count Five is similarly deficient because the indictment does not allege that Mr. Pullman's object was to deprive Company A of its money or property.

**E. Counts Four through Seven do not allege materiality.**

Although the statutory text says nothing of materiality, the Supreme Court in Neder said, "[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Neder, 527 U.S. at 25. The indictment's honest services wire fraud allegation at Count Four largely repeats the statutory text without alleging the materiality element that Neder added. (D.E. 17 at 33.) An indictment missing offense elements is not sufficient. See Hamling, 418 U.S. at 117; Tomasetta, 429 F.2d at 979-980; Troy, 618 F.3d at

34. Thus, Count Four should be dismissed.

The indictment's wire fraud allegations at counts Five through Seven are also deficient. Those counts seem to allege materiality by saying the Commonwealth and Companies A and B would not have engaged with Mr. Pullman if they had known about the alleged money payments from Ms. Lynch. (D.E. 17 at pp. 34, 35, and 36; D.E. 17 at ¶37, ¶47, and ¶53.) However, the issue is not whether the companies and the Commonwealth would have engaged with Mr. Pullman had he disclosed payment. "[E]even if the defendant lies, *and even if the victim made a purchase because* of *that lie*, a wire fraud case must end in acquittal ..." Takhalov, 827 F.3d at 1314 (brackets and emphasis added), citing Shellef, 507 F.3d at 108. The relevant issue is whether the alleged victims received what they bargained for. If they did, then no material fraud occurred and no wire fraud offense exists. See Takhalov, 827 F.3d at 1314; See also Shellef, 507 F.3d at 108. Here, the indictment makes no allegation that the alleged victims were denied what they bargained for.

Therefore, the indictment does not allege a fraud that is material and Counts Four through Seven should be dismissed.

**F. Count Four of the indictment does not allege a *quid pro quo* or an official act associated with the DOL settlement.**

Skilling limited honest services fraud crimes to cases involving bribes or kickbacks. Skilling, 531 U.S. at 404 & 412. A bribe requires a "specific intent to give or receive something of value *in exchange* for an official act." United States v. Sun-Diamond Growers of California, 526 U.S. 398, 404-05 (1999) (emphasis in original). A kickback generally "involves an employee steering

business of his employer [an official act] to a third party *in exchange* for a share of the third party's profits on that business." United States v. DeMizio, 741 F.3d 373, 387 (2d Cir. 2014) (emphasis and brackets added); see also Lusk, 2017 WL 508589 at *8. Thus, both a bribe and a kickback require a *quid pro quo.*

Count Four makes no reference to an agreement between Ms. Lynch and Mr. Pullman with each knowing Mr. Pullman would receive a monetary reward for his official action. McDonnell v. United States, 136 S. Ct. 2355, 2371 (2016) ("A jury could, for example, conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an official act in return.")

Moreover, the government makes no allegation that Mr. Pullman performed an "official act"—a term interpreted narrowly by the Supreme Court in McDonnell.[10] The government says nothing of an official act in Count Four's charging language, but it suggests in Count One (alleging conspiracy to commit RICO) that Mr. Pullman "directed companies and individuals seeking support

---

[10] "In sum, an official act is a decision or action on a question, matter, cause, suit, proceeding or controversy. The question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specific and focused that is pending or may by law be brought before a public official. To qualify as an official act, the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an official act, or to advise another official, knowing or intending that such advice will form the basis for an official act by another official. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit that definition of official act." McDonnell, 136 S. Ct. 2355 (2016) (citations and quotation marks omitted).

from SPAM to the Lobbying Firm." (D.E. 17 at ¶20.) However, "setting up a meeting" or "organizing an event (or agreeing to do so) … does not fit the definition of official act." <u>McDonnell</u>, 136 S. Ct. at 2372. More importantly, Companies A and B had no connection to the DOL settlement alleged in Count Four.

As for the factual allegations made relative to the DOL settlement in Count Four, the indictment makes no allegation that Mr. Pullman conducted the DOL negotiations to the lobbying firm's benefit and to SPAM's detriment because knew he would be financially rewarded.

As a result, Count Four of the indictment fails to allege a *quid pro quo*, which is an element necessary to proving honest services wire fraud.

**G. Count Four does not adequately allege a fiduciary duty.**

<u>Skilling</u>—and circuit courts before and after that decision— recognize that breach of a fiduciary duty is an element of honest services fraud. <u>See</u> <u>Skilling</u>, 561 U.S. at 407; <u>Sawyer</u>, 85 F.3d at 732; <u>United States v. Halloran</u>, 821 F.3d 321, 337 (2d Cir. 2016); <u>United States v. Nayak</u>, 769 F.3d 978, 980 (7th Cir. 2014).

The indictment alleges that "as a law enforcement officer" Mr. Pullman "owed a fiduciary duty and a duty of honest services to SPAM, the Membership, and the Commonwealth to perform his job and official duties free from fraud, deceit, and self-enrichment and to refrain from accepting, or agreeing to accept bribes and kickbacks." (D.E. 17 at ¶14.)

While this allegation is a start, it forgets to allege the nature and

scope of the fiduciary duty, thereby failing to put Mr. Pullman on notice of how, in the government's estimation, he breached it. See Lusk, 2017 WL 508589 at *8-11; Skilling, 561 U.S. at 417 (Scalia, concurring) ("to say that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry .... What obligations does he owe as a fiduciary?"); see generally SEC v. Chenery Corp., 318 U.S. 85-86 (1943) ("But to say that a man is a fiduciary only begins [the] analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations?").

To allege, as the government does here, that being deceitful violates Mr. Pullman's fiduciary duty forgets that deception does not necessarily violate the fraud statutes. See Takhalov, 827 F.3d at 1315-16; Shellef, 507 F.3d at 108.

To say Mr. Pullman had a duty not to engage in fraud forgets that the indictment does not allege that his *object* was to deprive others of his honest services or to deprive others of their property. See Kelly, 140 S. Ct. at 1573 & n.2 (citing Walters, 997 F.2d at 1224 (7th Cir. 1993)).

To say that Mr. Pullman has a duty not to engage in self-enriching conduct forgets the indictment's failure to allege how Mr. Pullman's self-enrichment also alleges that he failed to render honest services.

Finally, the government alleges Mr. Pullman owed a fiduciary duty to the Commonwealth of Massachusetts relative to the DOL negotiations.

An allegation of a fiduciary duty is but a starting point. What defines Mr.

Pullman's duty to the Commonwealth of Massachusetts? What is the

scope of that duty, especially in this circumstance where Mr. Pullman—

as the President of SPAM—was required to negotiate against the

Commonwealth during the DOL settlement?

By not sufficiently alleging the nature and scope of Mr. Pullman's

fiduciary duty to "SPAM, the Membership, and the Commonwealth," the

government leaves Mr. Pullman materially unable to plead an acquittal

here and to plead double jeopardy in any future prosecution. Therefore,

Count Four should be dismissed.

## II.   Count Three should be dismissed as duplicitous and because it fails to state a conspiracy to commit honest services wire fraud.

### A. Count Three is Duplicitous.

Count Three alleges conspiracy to commit honest services wire fraud and

conspiracy to commit wire fraud in the same count. (D.E. 17 at 32, ¶¶ 86-87.)

A count is duplicitous where it charges two crimes with separate elements in

one count. See United States v. Abakporo, 959 F. Supp. 2d 382, 390-91

(S.D.N.Y. 2013); see also United States v. Prieto, 812 F.3d 6, 11 (1st Cir. 2016)

(explaining that the rule against duplicity is borne out of "concern [] that a

criminal defendant facing such an indictment might not know which charge to

prepare to defend against.")

As shown above (*Supra* pp. 6-16.), wire fraud does not have the same

elements as honest services wire fraud. The two crimes require proof of

schemes done with different objects in mind, and honest services wire fraud

requires a fiduciary duty and an official act and wire fraud does not.

**B. Count Three fails to state an honest services wire fraud offense.**

Not only is Count Three duplicitous, but one of the alleged conspiracies—conspiracy to commit honest services fraud—is not sufficiently alleged. As explained above (*Supra* pp. 15-17), the government has alleged that Mr. Pullman owed a fiduciary duty to the Commonwealth while negotiating the DOL settlement. However, Mr. Pullman was negotiating the DOL grievance <u>against</u> the Commonwealth, on SPAM's behalf. The indictment fails to allege the source of Mr. Pullman's duty to the Commonwealth, the scope of that duty, and how he breached that duty given these facts. (*Supra* pp. 16-17.) One cannot conspire to breach a duty one did not owe, and consequently, Count Three fails to state a conspiracy to commit honest services wire fraud offense.

Count three should be dismissed.

**III.   Count Two relies upon predicate racketeering acts that should be dismissed.**

Count Two alleges that Mr. Pullman and Ms. Lynch engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Count Two relies upon a series of predicate racketeering acts that cannot be relied upon to support Count Two, and thus, those acts should be dismissed.

**A. Racketeering acts 1A through 1B**.

Racketeering act 1A realleges Count Four, the honest services wire fraud crime involving the DOL settlement. For the reasons previously stated (*Supra* pp. 9-17), Count Four should be dismissed thereby resulting in the dismissal of racketeering act 1A.

Racketeering act 1B alleges Mr. Pullman violated a Massachusetts commercial bribery statute, see M.G.L. Ch. 271 § 39(a), by accepting $20,000 from Ms. Lynch for conduct performed on the DOL settlement.

18 U.S.C. § 1961(1)(A) defines racketeering activity as "any act or threat involving ... bribery ... which is chargeable under state law and punishable by imprisonment for more than one year." Mr. Pullman is not "chargeable" under this statute in state court because the statutes relates to "persons or corporations engaged in private business and not to acts of public officers." See Commonwealth v. Benoit, 347 Mass. 1, 4 (1964). The government has charged Mr. Pullman as police officer employed by the Commonwealth of Massachusetts, not as an employee engaged in private business.

**B. Racketeering acts 2A through 2E.**

Racketeering acts 2A through 2D reallege Count Five, the wire fraud crimes involving Company A. For the reasons previously stated (*Supra* pp. 9-13), Count Five should be dismissed thereby resulting in the dismissal of acts 2A through 2D in Count Two.

Racketeering act 2E again alleges that Mr. Pullman violated the Massachusetts commercial bribery statute, see M.G.L. Ch. 271 § 39(a), by accepting $5,000 from Ms. Lynch for conduct associated with Company A. For the same reasons as those detailed above, Mr. Pullman is not chargeable under this statute in state court.

**C. Racketeering acts 3A through 3C.**

Racketeering acts 3A through 3B reallege Counts Six and Seven, the wire

fraud crimes involving Company B. For the reasons previously stated (*Supra* at pp. 9-13), Counts Six and Seven should be dismissed thereby resulting in the dismissal of acts 3A and 3B from Count Two.

Racketeering act 3C again alleges Mr. Pullman violated the Massachusetts commercial bribery statute, <u>see</u> M.G.L. Ch. 271 § 39(a), by accepting $5,000 from Ms. Lynch for conduct associated with Company B. For the same reasons as those detailed above, Mr. Pullman is not chargeable under this statute in state court.

## IV.   Count One Conspiracy to commit racketeering.

For the reasons stated above, the indictment's allegation concerning the Massachusetts commercial bribery statute is not an offense and any reference to as an act of racketeering should be stricken from Count One.

## <u>Conclusion</u>

For the reasons stated above, Counts Three through Seven should be dismissed, the racketeering acts associated with those counts should be dismissed from Count Two, and references to the Massachusetts commercial bribery statute should be stricken from Count One.

DANA A. PULLMAN
By his attorneys,

*/s/ Oscar Cruz*
Oscar Cruz
  B.B.O. No. 630813
*/s/ Brendan Kelley*
Brendan Kelley
  B.B.O. No. 569054
Federal Defender Office
51 Sleeper Street
Boston, MA  02210
Tel: 617-223-8061

## Certificate of Service

I hereby certify that this document was sent electronically to those registered through ECF on April 5, 2021

*/s/ Oscar Cruz*
Oscar Cruz