UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | Criminal No.: 19-cr-10345-DPW |
| ) | |
| v. ) | |
| ) | |
| DANA A. PULLMAN and ) | |
| ANNE M. LYNCH, ) | |
| Defendants ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**
<u>**AS TO DANA A. PULLMAN**</u>

Dana A. Pullman wielded power and influence as a long-time Massachusetts State Police Trooper who ascended the ranks within the State Police Association of Massachusetts (SPAM), ultimately serving as the elected President of the union. With great power comes great responsibility: Pullman was sworn to uphold the law, to protect the Commonwealth, and to represent his constituent SPAM members. But instead of using his power responsibly for the benefit of those who trusted him, Pullman used his power to break the law and feed his greed. He and SPAM lobbyist Anne M. Lynch ran SPAM as a racketeering organization for their own financial benefit for six years, depriving the union and the Commonwealth of Massachusetts of their right to Pullman's honest services; defrauding vendors looking to do business with the Massachusetts State Police; and attempting to obstruct the federal investigation into their crimes.

After a 20-day trial, a jury found Pullman guilty of Racketeering Conspiracy (Count I), Honest Services Wire Fraud (Count II), Wire Fraud (Counts III through VII), Obstruction of Justice (Count VIII), Conspiracy to Defraud the United States (Count X) and Aiding and Assisting the Filing of a False Tax Return (Counts A and B). Pursuant to the Court's November 4, 2022 Procedural Order (Docket No. 236), the United States submits this Sentencing

1

Memorandum to address the application of the United States Sentencing Guidelines and the various sentencing factors under 18 U.S.C. § 3553. As set forth below, the government recommends that Pullman be sentenced to 63 months of imprisonment.

## ADVISORY SENTENCING GUIDELINES

The government agrees with Probation that Pullman's Total Offense Level under the United States Sentencing Guidelines (Guidelines) is 26. Presentence Investigation Report (PIR) ¶ 70. The government also agrees with Probation's Guidelines calculation as to Counts X, A and B (Group 2) charging conspiracy to defraud the United States and aiding and assisting in the filing of a false tax return. PIR ¶¶ 58-63. With respect to Probation's Guidelines calculation as to Counts I through VIII (Group 1), charging racketeering conspiracy, honest services wire fraud, wire fraud and obstruction, the government disagrees with Probation's methodology but agrees that the resulting calculation of the adjusted offense level is 26. PIR ¶¶ 51-57.

    **A. The Court Should Apply USSG § 2C1.1 to Count II and USSG § 2B1.1 to Counts III through VII.**

The government disagrees with Probation's application of Guidelines Section 2C1.1 to Counts III through V of conviction, which charged wire fraud in violation of 18 U.S.C. § 1343 as to Mark43 and Taser International, Inc. *See* PIR ¶ 51A. However, it is the government's position that Section 2C1.1 should be applied to Count II of conviction, which charged honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 in connection with the Days Off Lost settlement agreement between SPAM and the Commonwealth (the DOL Settlement). *Cf.* PIR,

2

¶ 51A.[1] While the resulting Guidelines calculation is the same, the government submits that the calculation must be arrived at differently as set forth in the PIR.

The Guidelines' Statutory Index gives the Court a choice between applying Section 2C1.1 and Section 2B1.1 for violations of the wire fraud statute. *See* USSG app. A. Section 2C1.1 bears the caption "Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right; Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions." The Commentary to Section 2C1.1 provides that the guideline will apply to convictions under 18 U.S.C. 1343 "if the scheme or artifice to defraud was to deprive another of the intangible right of honest services of a public official." USSG § 3C1.1 cmt. The background further explains that "[s]uch fraud offenses typically involve an improper use of government influence that harms the operation of government in a manner similar to bribery offenses." USSG § 3C1.1 cmt. background.

Section 2B1.1 also addresses offenses of fraud and deceit, among other things. USSG § 2B1.1. The Section 2B1.1 commentary indicates that it may apply to convictions under 18 U.S.C. § 1341 but elaborates that "a state employee who improperly influenced the award of a contract and used the mails to commit the offense may be prosecuted under 18 U.S.C. § 1341 for fraud involving the deprivation of the intangible right of honest services" and that "[s]uch a case would be more aptly sentenced pursuant to § 2C1.1." USSG § 2B1.1 cmt. n.17.

---

[1] The government submits that it erred in not originally recommending the application of Section 2C1.1 to Count II in its submissions to Probation. While the application of Section 2C1.1 to Counts III through V is inadvisable for the reasons set forth below, the *sua sponte* application of Section 2C1.1 in the PIR prompted the government's reconsideration of its original recommendation that Section 2B1.1 be applied to Count II.

In determining which of the two guidelines applies in the event of a scheme involving a public official, courts have focused on whether the scheme more closely resembles bribery or theft. *See, e.g.*, *United States v. Huizar-Velazquez*, 720 F.3d 1189, 1192 (9th Cir. 2013) (2C1.1 did not apply where defendant "schemed to trick the government out of its money" by evading import duties, "not to corrupt government officials"); *United States v. Orsburn*, 525 F.3d 543, 544 (7th Cir.2008) (2C1.1 did not apply to "simple theft by public officials" without bribes or kickbacks); *United States v. Rowland*, No. 3:14CR79 JBA, 2015 WL 1275655, at *3 (D. Conn. Mar. 19, 2015), *aff'd*, 826 F.3d 100 (2d Cir. 2016) (2C1.1 did not apply where defendant attempted "to conceal his criminal activities by sneaking past, rather than bribing, the government gatekeepers," such that "scheme did not involve the improper use of government influence … that is associated with bribery and similar schemes"). *Cf. United States v. Valladares*, 544 F.3d 1257, 1266 (11th Cir. 2008) (looking to whether "defendants' conduct more closely resembled a fraud achieved through bribery than a straight fraud" to determine whether fraud guideline or commercial bribery guideline applied); *United States v. Starks*, 157 F.3d 833, 835 (11th Cir. 1998) (district court should have applied guideline for bribery of public official rather than guideline for fraud and deceit where defendant convicted of violating Anti-Kickback statute paid kickbacks to induce referrals from state employee working in federal Medicare project).

The PIR correctly concluded that Pullman was a public official, based on his position as an MSP Trooper. *See* PIR ¶ 52.[2] Under this framework, Probation's decision not to apply

---

[2] The PIR also mentions Pullman's positions with SPAM. PIR ¶ 52. The government notes that union leadership alone would render Pullman a public official under the Guidelines. USSG § 2C1.1 cmt. n.1.

4

Section 2C1.1 to Count II is incorrect. Count II specifically charged the defendants with a scheme to defraud "SPAM, the Membership, and the Commonwealth" of their right to Pullman's honest services, and the facts proved at trial support the conclusion that Pullman used his position to cause the Commonwealth to pay SPAM $350,000, and to steer SPAM's DOL review work to Lynch Associates, or at a minimum agreed to pay Lynch Associates a higher price, in exchange for a kickback. *See United States v. Reese*, 681 F. App'x 846, 849 (11th Cir. 2017) (finding no error in district court's application of 2C1.1 where indictment charged defendants with devising scheme to "defraud and deprive *the citizens of Chatham County* and the Chatham Area Transit Authority of their right to honest and faithful services" and court properly found that defendants were public officials).

A closer question is whether Section 2C1.1 applies to Counts III through V, particularly given how the counts were charged. Unlike Count II, Counts III through V did not charge an honest services fraud scheme aimed at defrauding *the public* of its right to *honest services* through bribes or kickbacks. Instead, Counts III through V charged schemes to defraud Mark43 and Taser of *their money and property*. Moreover, the government did not argue to the jury that the payments were bribes or kickbacks; instead, it argued that the fact of the payment was material to the vendor and should have been disclosed. Application Note 1 to Guidelines Section 1B1.2 and the introduction to the Guidelines' Statutory Appendix both require that the Court select the applicable guideline based only on "the offense conduct charged in the count of which the defendant was convicted." USSG § 1B1.2 cmt. n. 1; *accord* USSG app. A (introduction). Although Counts III through V do reallege and incorporate the general allegations contained in paragraphs 1 through 20 of the Indictment, which allege facts indicating that Pullman owed a

5

duty of honest services to the public, the "conduct charged" in Counts III through V demonstrates that Section 2B1.1, rather than Section 2C1.1, is the most appropriate guideline. *See generally United States v. Almeida*, 710 F.3d 437, 441-42 (1st Cir. 2013) (discussing parameters for making choice-of-guideline determination).

As set forth below, application of Section 2C1.1 to Count II produces the highest offense level for the PIR's Group 1, and thus becomes the determinative calculation for Counts I through VIII. PIR ¶ 51 (citing USSG § 3D1.2(b),(c) and (d)); USSG § 3D1.3(a).

**B. The Value of the Benefit Received for the DOL Settlement is $350,000.**

Pullman has asserted that Lynch Associates provided valuable services to SPAM in connection with the DOL Settlement, and therefore the $350,000 SPAM payment to Lynch Associates is not an accurate assessment of the loss to SPAM or the value of the benefit received by Lynch. *See* PIR, Pullman's Objections Nos. 2 and 6 (advocating that $20,000 kickback should be used as loss). While the value of the benefit received means the net value of such benefit (USSG § 2C1.1 comm. n.3), the government maintains that there were no legitimate services rendered by Lynch Associates that should be credited against the $350,000. There was sufficient evidence at trial that Lynch Associates was paid a $9,500 monthly retainer for its work with SPAM, and that the DOL Settlement work should have been included in its obligations to SPAM under the retainer agreement. (Day 4, p.128; Day 5, pp.14, 43). Indeed, Lynch Associates had done similar work for the Office and Professional Employees International Union (OPEIU), securing a $60 million settlement for court employees, as part of its monthly retainer obligations to OPEIU. (Day 13, pp.113-114). Essentially, Lynch Associates was paid twice for the work it performed for SPAM on the DOL Settlement, and therefore no deduction for services rendered is

warranted. *See* PIR ¶ 51B; *United States v. Pena*, 268 F.3d 215, 219 (3d Cir. 2001) ("the concept of netting out costs to arrive at profit is inappropriate under the Guidelines section when the transactions are entirely illegitimate").

### C. The Loss to Mark43 is $20,000 and the Loss to Taser is $138,000.

Similarly, Pullman argues that Lynch Associates performed valuable services for Mark43 and Taser, and that the loss as to Counts III through V is limited to the $10,000 in payments Lynch made to Pullman. PIR, Pullman's Objection No. 6. However, the evidence at trial established that Lynch Associates performed very little valuable work and secured no deals for these aspiring MSP vendors.

As to Mark43, the evidence at trial established that Lynch took advantage of Scott Crouch's inexperience and talked him into a $20,000 contract for 19 days' worth of purported work. (Ex.97). Knowing that Mark43 could never meet the standards of the MSP Request for Proposal (RFP) because the company did not even have a product yet, Lynch nevertheless made the hard sell to Crouch, and when she succeeded in talking him into hiring Lynch Associates, Lynch wanted credit for pricing the deal because she knew full well it was not worth $20,000. (Ex. 255). Further, while Pullman and Lynch secured the Mark43 contract by touting Lynch's personal connections and expertise in procurement, they pulled a bait and switch after Crouch signed the contract: Lynch all but disappeared, and her son, Peter D'Agostino, took over the RFP review process. D'Agostino was a decorated military veteran who never graduated from college and had no relevant experience, and as expected, Mark43 lost the RFP.

As to Taser, the evidence at trial established that the company had a different lobbying firm on retainer and did not need or want services that Lynch Associates purported to provide. In

fact, the Taser representative said as much to Pullman and Lynch, but based on Pullman's words and actions, the company felt it could not sell Tasers to the MSP without hiring Lynch Associates. As with Mark43, Taser representatives thought they were buying Lynch's services, but they ended up with D'Agostino, who was unable to close any deals for Taser. And like Mark43, Taser essentially paid Lynch Associates to spin its wheels, and received little valuable service for its monthly retainer.

In a fraud case such as this, where the claimed services rendered "were demonstrably rife with fraud, a sentencing court may use the face value of the claims as a starting point in computing loss." *United States v. Ahmed*, 51 F.4th 12, 25 (1st Cir. 2022) (quoting *United States v. Alphas*, 785 F.3d 775, 784 (1st Cir. 2015)). In such a case, the burden of production should then shift to the defendant, who must offer evidence to show why the loss figure should be set at a lower amount. *See United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015). Because these contracts were rife with fraud, and because Pullman has not offered evidence to show that the loss should be lower, the Court should value the loss as to Counts III through V at $158,000. *See* PIR, ¶ 53A.

**D. The Total Offense Level for Group I is 26.**

Using Section 2C.1 to calculate the offense level for Count II and Section 2B1.1 to calculate the offense level for Counts III through VII, the offense level for Group I is 26. Specifically, the adjusted offense level for Count II is 26:

- Because Pullman was a public official, the Base Offense Level is 14. § 2C1.1(a)(1).

- The value of the benefit Lynch received for the kickback to Pullman was $350,000, and therefore a 12-level increase is warranted. USSG §§ 2C1.1(b)(2); 2B1.1(b)(1)(F).

And the adjusted offense level for Counts III through VII is 23:

- Because wire fraud has a statutory maximum term of imprisonment of 20 years, the Base Offense Level is 7. § 2B1.1(a)(1).

- The loss to Mark43, Taser and SPAM is $322,140,92, and therefore a 12-level increase is warranted. USSG § 2B1.1(b)(1)(G).[3]

- Because Pullman abused a position of trust, a 2-level increase is warranted. USSG § 3B1.3.

- Because Pullman obstructed justice, a 2-level increase is warranted. USSG § 3C1.1.

Under Section 3D1.3(a), because the calculation of Count II yields the higher adjusted offense level, it is the determinative calculation for Group I.

## 18 U.S.C. § 3553 FACTORS

A 63-month term of incarceration is sufficient, but not greater than necessary to achieve the goals of Section 3553. Although Pullman continues to deny his guilt, he stands convicted by a jury of using the powers of his positions with the MSP and SPAM for the private gain of himself and Lynch. Almost as soon as he reached the pinnacle of his career – his election as SPAM President in late 2012 – he and Lynch arranged a payoff system that began with the DOL Settlement kickback and ended in a pay to play system whereby Pullman directed businesses looking to do business with the MSP to Lynch in exchange for disguised payments for Pullman's benefit. As the opportunities arose, Pullman and Lynch used Pullman's power and influence to

---

[3] This includes the $184,140.92 loss to SPAM for Pullman's wire fraud charged in Counts Vi and VII.

9

secure fraudulent payments to Lynch Associates that Lynch shared with Pullman. This was not a singular lapse of judgment. Pullman and Lynch turned SPAM into a racketeering organization, using Pullman's power to line their own pockets for almost six years.

Moreover, Pullman's fraud did not end with the hidden DOL Settlement kickback and the fraudulent Mark43 and Taser payments. In fact, Pullman stole directly from SPAM – an organization funded almost entirely with dues paid by MSP Troopers – when he used the SPAM debit card to pay for personal expenses, including meals, travel, and flowers for his girlfriend. But even the unfettered use of the SPAM debit card was not enough for Pullman; he also claimed false expense reimbursements from SPAM, and he included unreimbursed business expenses on his tax returns. And he did not include the Lynch payments on his personal tax returns. Pullman's avarice was simply unlimited.

Pullman's reaction when he learned of the federal grand jury investigation into SPAM's Executive Board expenses is particularly reflective of his character. Several years' worth of expense records disappeared while Pullman was in the SPAM offices, and Pullman suggested to his protégé Andrew Daly that they lie to the grand jury about SPAM's document retention policies. When Daly refused, Pullman had Lynch do his dirty work: he tasked Lynch with asking SPAM's attorney to delay production of records subpoenaed by the grand jury so that the coconspirators could come up with receipts in a last-ditch attempt to justify Pullman's expense reimbursements. Luckily, Pullman's power had limits: Daly and SPAM's attorney declined to obstruct justice for Pullman, putting an end to his reign of greed.

To be sure, as SPAM President, Pullman was credited with supporting SPAM membership by, among other things, securing the DOL Settlement and beneficial collective

bargaining agreements. The government expects that Pullman will tout those accomplishments in arguing for a lower sentence. However, creditable work for the union is to be expected from its President, and any accomplishments were part of the job the SPAM membership elected him to perform and for which he was paid both by SPAM and the MSP. Meanwhile, behind the backs of the members, Pullman was stealing from the union coffers, which were funded almost exclusively with membership dues.

In addition to being President of SPAM, Pullman was a trained police officer sworn to uphold and enforce the law, which exacerbates Pullman's knowing misconduct in this case. With his crimes, Pullman has brought embarrassment to the law enforcement profession, and he has contributed to the contemporary erosion of trust in police officers.

Instead of "dedicate[ing] his life to public service," PIR ¶ 108, Pullman used public service for his own private gain. A significant sentence is necessary to promote respect for the law and serve as adequate deterrence. A police officer or union official who uses his position to commit fraud, including frauds that betrayed his employers, must be held accountable. Pullman's behavior was part of a long-running pattern of deceit and self-dealing, and Pullman and Lynch sought to monetize his positions of power at every turn. The sentence imposed must reflect the seriousness of the offenses as seen through that lens.

Further, Pullman's betrayal of his MSP oath and his SPAM constituents have further eroded trust in, and deeply hurt the reputations of the MSP and SPAM. As such, this case calls out for substantial general deterrence. Every police officer and union official should recognize that the consequences for engaging in racketeering, kickbacks, fraud, obstruction and tax evasion is a lengthy period if imprisonment. Pullman's public fall from grace makes this case an

appropriate vehicle for such a message, one that will resonate with police officers and union officials statewide.

A 63-month sentence for racketeering, honest services and property wire fraud, tax evasion and obstruction of justice for a public official is not aberrant. *See, e.g., United States v. Diane Wilkerson and Chuck Turner*, 08-10345-DPW (imposing sentences of 42 months for state legislator convicted of accepting $23,500 in bribes and 36 months for city councilor convicted of accepting $1,000 bribe and lying to FBI); *United States v. Jasiel Correia*, 18-cr-10364-DPW-1 (D. Mass.) (imposing 72-month sentence on mayor convicted of accepting bribes), *aff'd* 55 F.4th 12 (1st Cir. 2022); *United States v. Salvatore DiMasi*, 09-cr-10166-MLW-1 (D. Mass.) (imposing 96-month sentence on Speaker of House convicted of accepting $65,000 in bribes to wield influence on behalf of software company), *aff'd*, 727 F.3d 143 (1st Cir. 2013); *United States v. Cromwell*, 20-cr-10271-DPW (imposing 36-month sentence on Mashpee Wampanoag Tribe Chairman convicted of official right extortion and bribery involving over $13,500); *United States v. McDonough*, 959 F.2d 1137 (upholding 52-month sentence for police officer convicted under RICO with predicates including state bribery and obstruction); *United States v. Seabrook*, 2021 WL 2709360, *1 (S.D.N.Y. July 1, 2021) (former president of Correction Officers' Benevolent Association sentenced to 58 months after convictions for honest services wire fraud and conspiracy).

The government is not unmindful of Pullman's age (61) and other family circumstances explained in the PIR and believes that these factors warrant the imposition of a sentence at the low end of the Guidelines range of 63 to 78 months. Considering the Section 3553 factors, the sentence the government believes the following sentence is sufficient, but not greater than necessary:

- 63 months' incarceration;
- 24 months' supervised release;
- $534,140.92 in restitution to SPAM;
- $66,020.07 in restitution to Mark43[4];
- $138,000 in restitution to Taser;
- $12,901 in restitution to the IRS;
- $2,103 in restitution to the Massachusetts Department of Revenue; and
- A mandatory special assessment of $1,100.

Respectfully submitted

RACHAEL S. ROLLINS,
UNITED STATES ATTORNEY

Date:   May 3, 2023           By:   /s/Kristina E. Barclay
                                    KRISTINA E. BARCLAY
                                    NEIL J. GALLAGHER, JR.
                                    Assistant U.S. Attorneys

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Date: May 3, 2023                    /s/Kristina E. Barclay
                                     Kristina E. Barclay
                                     Assistant United States Attorney

---

[4] This number includes $46,020.07 in attorneys' fees and costs described in the Declaration of Kaitland Kennelly submitted to Probation. *See In re: Akebia Therapeutics, Inc.*, 981 F.3d 32 (1st Cir. 2020).

13