## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.: 19-10345-DPW |
| | ) | |
| DANA PULLMAN | ) | |

## SENTENCING MEMORANDUM ON BEHALF OF DANA PULLMAN

For 37 years, Dana Pullman dedicated himself to the people of Massachusetts, with the last six years of his career spent undertaking the important but unenviable position of representing the interests of the men and women of the Massachusetts State Police rank and file as the president of their collective bargaining unit. The jury found him guilty of committing a series of opportunistic crimes. At the same time, the government and its witnesses uniformly recognized that Mr. Pullman doggedly fought to improve the lives of the Massachusetts State Police rank and file and their families, a battle he was well suited for and at which he had remarkable success.[1] For the reasons that follow, the Court should find that the guideline sentencing range, properly calculated under U.S.S.G. §2B1.1, is 33-41 months based on an offense level of 20 and criminal history category I. Regardless of the calculated guideline sentencing range, a sentence of time served with three years' supervised release to follow, which

---

[1] *See* Government's Opening Statement, Day 3 (Oct. 3, 2022), 7:13-22 ("Now, during this trial you're going to hear…that they thought Dana Pullman was a fierce advocate for SPAM. He was a tough negotiator and he had the kind of personality that can get things done. He was able to get significant pay increases through the collective bargaining agreement for the union members. And he could be compassionate with a trooper and their family. That side of Dana Pullman is not on trial and that side of Dana Pullman is not in dispute."); Government's Closing Statement, Day 15 (Oct. 27, 2022), 9:8-16 ("And over the last several weeks you heard a lot about the good things that SPAM and even Dana Pullman and Anne Lynch did over the years. The DOL settlement itself…the actual money paid to those state troopers was a great result. Donations to charities, assistance to families of fallen officers, gifts for retirees, good employment contracts for troopers. We acknowledge those were all good things.").

supervision should include twelve (12) months of home confinement, is sufficient, but not greater than necessary, to comply with the sentencing factors under 18 U.S.C. § 3553(a) and achieve the goals of sentencing.

## BACKGROUND

**A.  DANA PULLMAN'S HISTORY AND CIRCUMSTANCES**

1.  Growing Up and Formative Years

Dana Pullman is the youngest child and only son of Bernard and Mary Pullman. Bernard Pullman, Jr. was a combat veteran of World War II who for a period of time was missing in action. Believing she would never see him again, Mary became engaged to someone else until finding out that Bernard was indeed alive. Bernard and Mary would later marry and start a family. Bernard, along with his wife, were part of the many veterans who settled in suburban Natick after the war, and Dana Pullman grew up in his parent's modest colonial home on Surrey Lane.

Bernard Pullman was a partner in a lumber company in the Natick area, supplying lumber for the post-war boom. Mary Pullman cared for their two daughters, then eleven and nine years-old, respectively, when Dana Pullman was born. *See* Exhibit A – Letters in Support at 1-2 (Claire Cofran). Mr. Pullman grew up in this idyllic neighborhood of young families and veterans like his own. *See* Exhibit A at 5 (Paul Adams). This would form a foundation which would one day lead Mr. Pullman to his career with the State Police.

The first seminal crossroad of Mr. Pullman's life was the death of his father when he was just nine years old. Shortly after his birth, Mr. Pullman's father suffered his first severe heart attack. *See* Exhibit A at 1 (Cofran). Though he recovered from that event, in April 1971, Bernard

Pullman suffered another severe heart attack unexpectedly and passed away.[2] *See* Exhibit A at 3 (Janet Harrington). His death was an upheaval to the family. Mary Pullman was then a nurse at St. Elizabeth Hospital in Brighton. After her husband's death, she did what she could to help run the lumber business for a few years before returning to nursing. The family struggled with the loss of income and emotional support. Mr. Pullman's uncle became a father-figure in his life. For his part, Mr. Pullman began working in the family business from age twelve, loading and unloading pallets at the lumber yard.

Mr. Pullman's adolescence included attending Marian High School in Framingham where he was a standout playing defense on the hockey team. After graduation, he explored his options as a hockey player – rather than attending college, he began playing semi-pro junior hockey in Canada. His dreams of a hockey career ended, however, at age nineteen when he learned that his then-girlfriend, Anne Heinan, was pregnant.

Like Mr. Pullman, Ms. Heinen was just nineteen years-old when she learned she was pregnant. Upon learning Ms. Heinen was expecting, Mr. Pullman returned to Boston and the two married in August 1981. Hockey aspirations abandoned, Mr. Pullman turned to steady work opportunities to provide for his wife and daughter, Tonianne (now age 41), whose birth would follow in January 1982. As his daughter grew older and the couple set their sights on more children and long-term stability, Mr. Pullman sought a secure career with income and benefits for his family (he previously worked painting and briefly as a toll booth attendant). Owing to his physical demeanor and fearlessness, he applied to become a trooper recruit with the State Police and entered the 68th Recruit Training Class in February 1987. Ms. Heinen gave birth to their next child, Kurt Pullman (now 36), shortly thereafter in July 1988.

---

[2] In a twist of fate, Bernard Pullman, Jr.'s father, Bernard Pullman, Sr. also tragically passed away in his forties when Bernard, Jr. was in his childhood.

2.  <u>Mr. Pullman's State Police Career</u>

After successfully completing police academy boot camp training, Mr. Pullman would go on to serve the State Police in numerous capacities, first as a road trooper in Western Massachusetts before being promoted to the Massachusetts State Police's Violent Fugitive Apprehension Section, where he served for several years apprehending dangerous wanted individuals charged with crimes. His duty assignment included serving as an instructor at the State Police Academy where he participated in firearms training and defensive tactics for recruits. As his career progressed, he was tapped to coordinate construction detail and transportation plans, tasked with assuring the safety of motorists, law enforcement, and construction workers. Ultimately, he would go on to become a SPAM representative and executive board member. Commendations of Mr. Pullman's actions as a State Trooper are attached as Exhibit B. These include (amongst others):

- Commendations from the US Department of Justice Immigration and Naturalization Service in 1989 for assistance "in the removal of Jamaican Posse members during 'Operation Clean Streets'";

- A Commendation from the Massachusetts Department of Corrections for assisting in the apprehension of three escaped prisoners from Southeast Correctional Center in 1994;

- A recognition of his assistance in 1989 in the arrest of four suspects wanted for a serious assault at the Grafton Job Corps Center; and

- A recognition of his work as a firearms instructor for the 120 recruits of the 76th RTT during their 25-week training on firearms in 2002.

In addition to these Commendations and recognitions, Mr. Pullman's supporters and former colleagues are replete with examples of his hard work, dedication, and time attending to his comrades in the State Police. *See* Exhibit A. The demands required of law enforcement officers unsurprisingly have significant impact on their family life – assisting with this emotional fallout is in fact part of the role that SPAM played with its members. *See* Testimony of Andrew

Daly, Day 5 (Oct. 6, 2022), 126:7-127:1 and Day 6 (Oct. 11, 2022), 27:1-25; Exhibit A at 3

(Harrington) ("His early job as a State Trooper presented those demands of working long hours,

missing family events and being in harm's way.")).[3] Mr. Pullman was no different. In 1994,

while Mr. Pullman was still assigned to the Violent Fugitive Apprehension Section, he and his

first wife divorced. He remained close to his wife and children and maintained a presence in their

lives. In 1995, Mr. Pullman requested a move back to the Weston Barracks and moved his

residence to be closer to his children.

In October 2000, Mr. Pullman remarried to his current wife, Melissa, who was then also a

trooper with the State Police. The two would soon start their family together, welcoming their

oldest son, Brett Pullman (now age 21), in September of 2001, his brother, Jack Pullman (now

age 19), in March of 2003 and their youngest son, D.P. (now age 17), in April of 2006. Despite

the demands of his work, Mr. Pullman was a strong presence in the lives of his sons.

Fate would again intervene in Mr. Pullman's life when  Its

impact on the family – particularly during his youth – has been significant.

---

[3] For example, SPAM advocated on behalf of members designated to assignments in distant parts of Massachusetts, and those having time-off cancelled and missing important family events. *See* Testimony of Kevin Fredette, Day 4 (Oct. 4, 2022), 108:19-109:1 and Testimony of Andrew Daly, Day 6 (Oct. 11, 2022), 17:8-17.

As trial revealed – and as attested to by the letters of support in Exhibit A – Mr. Pullman served SPAM in a major leadership capacity for ten years all told, first for four years as its Treasurer and the last six as President. While the trial's focus rested largely on the circumstances underlying the offenses of conviction, his tenure involved significant accomplishments, as the government concedes. Edward Hunter described Mr. Pullman as working "very hard" on behalf of SPAM, confirming that he never sat around and it was not unusual for Mr. Pullman to work late into the night. *See* Testimony of Edward Hunter, Day 4 (Oct. 4, 2022), 65:8-66:1. Vice-President Kevin Fredette verified Mr. Pullman's deep involvement in the affairs of the union and its members. *See* Testimony of Kevin Fredette, Day 4 (Oct. 4, 2022), 107:25-109:5. Union business was always foremost on Mr. Pullman's mind, no matter the setting, and it would be hard to imagine anyone having a conversation with Mr. Pullman for long before the union didn't come up in some way. *See* Testimony of Andrew Daly, Day 6 (Oct. 11, 2022), 131:3-20. Mr. Pullman's tenacity resulted in the best contractual settlements the members would receive. *See* Testimony of Kevin Fredette, Day 4 (Oct. 4, 2022), 107:18-19.

Beyond bargaining contracts, the union successfully opposed the Executive Office of Public Safety and State Police's efforts to shutter the Brookfield Barracks. *See* Testimony of Andrew Daly, Day 6 (Oct. 11, 2022), 126:19-127:20. This closure would have impacted the local communities significantly by reducing the presence of the State Police, upon whom local non-24-hour police agencies strongly relied. And it would have greatly increased the danger for Troopers by placing backup significant distances from them in dangerous situations. Also, through the efforts of Mr. Pullman, the union secured new body armor to replace bullet-proof vests which were out of warranty. Without Mr. Pullman's efforts, these unsafe vests would have

remained on the chests of troopers as their protection. One month after these efforts, a suspect shot a trooper in the ribcage and his life was saved by his new vest.

Mr. Pullman ensured that union members had a vigorous advocate in their bargaining unit to guarantee fairness, consistency, and proportionality in any disciplinary matters brought by command staff, be it the mundane or the more high-profile instances such as those connected to the Whitey Bulger investigation, the Marathon Bombing, and the arrest of a Worcester judge's daughter.

Most critically, in the aftermath of line of duty deaths or other tragedies, Mr. Pullman personally intervened to assist the families of fallen officers to provide a dignified and honorable service and memorials. Mr. Pullman's response went beyond funerals and memorials to continue to be a presence and let the survivors remain a part of their loved one's State Police family. *See* Exhibit A at 26-27 (Sullivan), 30-31 (Rev. Fraini, III), and 32-33 (Barry). It was in this vein that Mr. Pullman spearheaded the establishment of the Benevolent Fund and License Plate initiatives, ultimately raising millions of dollars for the benefit of the families of law enforcement officers. Mr. Pullman executed a vision for long-term support which has a daily presence on the streets of this Commonwealth – every motorist displaying a "Protect and Serve" license plate funds the families of fallen officers.

Throughout Mr. Pullman's time as an active member of the SPAM executive board, he remained a presence in the lives of his children and family. The government's efforts at trial exposed for the world a brief period of his life which included his failings as a father and husband. The experience of this investigation, prosecution, trial, and conviction has been difficult but he maintains his close relationship with his wife, children, and grandchildren. *See* Exhibit A at 34-37 (Melissa Pullman).

3.  <u>The Pullman Family Current Circumstances</u>

The Pullman family continues to reside in their single-family home in Worcester. This prosecution has taken a deep toll on Mr. Pullman's family and himself. Mr. Pullman suffered the loss of his mother during the pendency of this case in February 2021. His eldest two children both have children of their own and are fearful that Mr. Pullman's grandchildren will miss out on the presence of their grandfather during these formative years.

Melissa Pullman herself has recently experienced serious medical issues herself which required the help of her husband. PSR ¶¶ 87, 91, Exhibit A at 35.  While Mr. Pullman served SPAM, she ran the household after retiring from the State Police. Since his own retirement in 2018, Mr. Pullman exchanged roles with his wife – taking on the managing of the household tasks while Ms. Pullman returned to work to make up for the change in income.[4] Owing to this change of roles, Mr. Pullman and his youngest sons have become closer in the aftermath of the arrest and prosecution in this case as they have emerged into young adulthood. The sentence in this case will significantly affect the family affairs – from the day-to-day things Mr. Pullman takes responsibility for to whether the family can continue to maintain their residence in his absence.

Most critically, Mr. Pullman is in poor health. Records provided to the Probation Department and summarized in Dr. Nitin Trivedi's summary letter, *see* PSR ¶ 97, demonstrate that Mr. Pullman suffers ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[4] It is presently uncertain what effect these convictions will have on Mr. Pullman and whether the Massachusetts State Retirement Board will seek to initiate proceedings to affect Mr. Pullman's pension.



## B.  NATURE AND CIRCUMSTANCES OF THE OFFENSE

Under the umbrella of racketeering, Mr. Pullman stands convicted of receiving $30,000 from Ms. Lynch ($25,000 in 2014 and $5,000 in 2016) during his approximately six years as president, to which the jury found he was not entitled. The jury likewise found him guilty of use of the union debit card for approximately $5,200 in charges related to Ms. Finsilver, and obstruction related to the overall investigation. Lastly, the jury convicted Mr. Pullman of willful failure to report monies received from Mr. Rafferty and Ms. Lynch in 2014 and 2016 which would have resulted in smaller refunds if declared as income.

Pullman's convictions and conduct related to these charges[5] are and will forever be a blemish on an otherwise admirable career of service to the citizens of this Commonwealth as a sworn Trooper marked by a unique doggedness in advocating for the interests of the men and women of the Massachusetts State Police rank and file. Being a Trooper was Dana Pullman's ethos – right down to the tattoo of the State Police bulldog on his left arm. It symbolizes his limitless determination in fighting for respect from command staff, better working conditions, and better benefits. It represents a steadfastness to the spouses and children of troopers injured or killed and unity in times of peril. The government does not dispute these traits.

It goes without saying that these traits and history are no excuse for Mr. Pullman's conduct as found by the jury's verdicts. But neither are they immaterial at sentencing, particularly where from the outset of this case the government has caricatured Mr. Pullman with an unmoderated narrative of power, avarice, and corruption.

## ARGUMENT

I. **Before Any Departures and Variances, Mr. Pullman's Guideline Sentencing Range is 33-41 Months, Based on a Criminal History Category of I and a Total Offense Level of 20.**

   a. **The Probation Department's Application of U.S.S.G. §2C1.1 to the Mark43 and Taser Fraud Counts is Misplaced; §2B1.1 is the Applicable Guideline.**

In preparing the final Presentence Report for disclosure to the parties and the Court, the Probation Department changed its method of calculating the guideline sentencing range by a new application of U.S.S.G. §2C1.1 (hereinafter "the bribery guideline") to the Wire Fraud

---

[5] This memorandum assumes that all current counts of conviction remain after consideration of his Renewed Motion for Judgment of Acquittal and Motion for New Trial [D.E. 254], however this is not a concession that the verdicts were correct. Should the Court grant Mr. Pullman's motion in whole or in part, he would request an opportunity to re-formulate his sentencing arguments based upon the surviving count(s) of conviction.

convictions encompassed in Counts 3-5 (Mark43 and Taser), thus supplanting U.S.S.G. §2B1.1 (the "fraud guideline"). Mr. Pullman objects to the guideline calculations applied in the Final PSR that result in a new total offense level of 26. *See* Final PSR, ¶¶ 50-70. He submits that §2B1.1 remains the appropriate sentencing provision to apply to Mr. Pullman's conduct and convictions for Group 1.

Under the general application principles of the guidelines, the Court is directed to utilize the Chapter Two section referenced in the Statutory Index (Appendix A) for the offense of conviction. U.S.S.G. §1B1.2(a) n.1. Where the guidelines' Statutory Index specifies more than one offense guideline for a particular statutory offense and no plea agreement stipulates to a more serious offense, the Court must select the most appropriate guideline based only on conduct charged in the indictment. *United States v. Almeida*, 710 F.3d 437, 438 (1st Cir. 2013).

In Count 2, the jury convicted Mr. Pullman of committing Honest Services Wire Fraud in connection with the DOL settlement in violation of 18 U.S.C. §§ 1343 and 1346. *See* D.E. 233-2. The convictions in Counts 3-7 involved violations of 18 U.S.C. § 1343 (Wire Fraud). *Id*. Appendix A contains no reference to 18 U.S.C. §1346 – the "scheme or artifice to defraud" definition which encompasses deprivation of another's intangible right of honest services. According to Appendix A, convictions for violations of 18 U.S.C. § 1343 direct the Court to either §2B1.1 or §2C1.1.

In its initial draft of the PSR, the Probation Department correctly used §2B1.1 – the Fraud Guideline – as the starting point to determine Mr. Pullman's total offense level for all of the counts alleging fraud and so calculated his adjusted offense level for Group 1 at 23.[6] In its

---

[6] Mr. Pullman objected to Probation's loss calculation and corresponding increase in offense level in the Draft PSR. Mr. Pullman maintains that objection and discusses this further here. The appropriate guidelines assessment for loss is $38,911.12, as outlined below. The adjusted offense level for Group 1 should be 19. The total offense level, as noted below, is 20.

calculation after its pivot to §2C1.1, however, the Probation Department determined the offense level for the Group 1 offenses should start with the Bribery Guideline to determine the offense level for Counts 3-5 (relating to Mark43 and Taser), which corresponded with a three-level increase to the total offense level.[7]

The Bribery Guideline's own terms demonstrate why §2C1.1. is inappropriate. The title of Part C is "Offenses Involving Public Officials and Violations of Federal Election Campaign Laws." Narrowing it further, the title of §2C1.1 is "Offering, Giving, Soliciting, Or Receiving a Bribe; Extortion Under Color Of Official Right; Fraud Involving The Deprivation Of The Intangible Right To Honest Services Of Public Officials; Conspiracy To Defraud By Interference With Governmental Functions." This section of the guidelines is clearly meant to be applied in cases dealing with governmental bribery and corruption – not wire fraud and embezzlement by the leader of an associational collective bargaining unit. *See* Exhibit 5 at 3 (referring to the organization as an "Association"). In fact, §2C1.1 only applies to wire fraud convictions where "the scheme or artifice to defraud was to deprive another of the intangible right of honest services **of a public official**." U.S.S.G. §2C1.1, *comment*. (Stat. Prov.).

The expansive definition of "public official" in the Application Notes to §2C1.1 does not undermine Mr. Pullman's position. The meaning of the term "public official" in §2C1.1 is unambiguous – particularly when read in combination with the reference to Part C's encompassing Violations of Federal Election Campaign Laws. Only in the commentary to §2C1.1 does one find a broader definition of that term. *See* U.S.S.G. §2C1.1 *comment*. (n.1).

---

[7] In the Final PSR, Probation concludes that §2B1.1 is the most appropriate guideline for Count 2 (regarding the DOL Settlement) and Counts 6 and 7 (wire fraud regarding personal expenses). Mr. Pullman agrees with this conclusion. Where Mr. Pullman and Probation diverge is in Probation's use of §2C1.1 – rather than 2B1.1 – for counts 3-5 (the wire fraud relating to Mark43 and Taser), and in the ultimate loss calculation. Consequently, this discussion focuses on the §2C1.1 determination by probation.

Where the guideline text is not genuinely ambiguous, the Court need not, and should not, defer to guideline commentary. *See United States v. Banks*, 55 F.4th 246, 255-56 (3d Cir. 2022) (relying on *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)), in holding that the Sentencing Commission's interpretation of the guidelines is not afforded deference unless the regulation is "genuinely ambiguous."

In his role of President of SPAM Mr. Pullman was not acting as a "public official" in the conduct charged in the Superseding Indictment relating to Mark43 and Taser (nor any other count of the Superseding Indictment). Mr. Pullman was instead the head of an association – not an elected governmental official or acting in the capacity as a member of government – when he interacted with those companies. *See United States v. Boggi*, 74 F.3d 470, 476-78 (3d Cir. 1996) (finding district court erred in applying Guideline §2C1.1 to a union official convicted of extortion in part because the defendant was not a public official). Mr. Pullman as President was on full-time release to SPAM from the State Police and had no day-to-day duties as a trooper and did no overtime details. *See* Testimony of Andrew Daly, Day 4 (Oct. 4, 2022), 121:5-16, Day 5 (Oct. 6, 2022), 129:6-130:4.

The government's Superseding Indictment supports the application of §2B1.1, rather than §2C1.1, in two ways. First, regarding Mark43 and Taser, the Superseding Indictment only alleges – and Mr. Pullman was only convicted of – wire fraud. He was not charged with or convicted of honest services wire fraud as to those two companies. *See* Superseding Indictment, D.E. 126, at ¶¶ 90-91, 92-93. Second, in the Superseding Indictment, the government charged Mr. Pullman with *commercial* bribery under Massachusetts state law for accepting money from Lynch Associates regarding the Mark43 and Taser contracts. The government did not charge those Racketeering Acts (which mirrored the stand alone wire fraud counts (Counts 3-5 of

conviction)) under the Massachusetts public official bribery and corruption laws. *Id.* at ¶¶ 74-81.[8] Nor did the Government endeavor to charge Mr. Pullman under 18 U.S.C. §666 (Theft or bribery concerning programs receiving Federal funds). Neither in response to the draft PSR guideline did the government assert that Mr. Pullman was a "public official" during the commission of any offense in the Superseding Indictment. Because, for purposes of the conduct underlying the convictions, he wasn't. As the jury found, he committed fraud by misrepresentations in his capacity as a private actor outside of the scope of his duties as President of SPAM.

As the Probation Department correctly concluded in the draft PSR, on the other hand, Section 2B1.1 – which by its terms applies to "Larceny, Embezzlement, And Other Forms Of Theft; Offenses Involving Stolen Property; Property Damage Or Destruction; Fraud And Deceit; Forgery; Offenses Involving Altered Or Counterfeit Instruments Other Than Counterfeit Bearer Obligation Of The United States" - more accurately captures the fraud conduct at issue in Counts 3-5. For all these reasons, the Court should conclude that §2C1.1 is inappropriate for use in these circumstances and should instead employ §2B1.1.

   **b.   The Correct Calculation of Loss -  $38,911.12 – Results in Only a Four-Level Increase in the Base offense Level**

The only remaining guideline dispute involves the calculation of loss. The Probation Department suggests a twelve (12) level increase based upon an intended loss figure of between $250,000 and $550,000 suggesting an intended loss amount of $350,000. PSR ¶51B. The Final PSR suggests an actual loss figure of $184,140.92 for Counts 6 & 7 and an undeterminable amount for Count 2. *See* Note 1 at 15. The Probation Department instead included the $350,000

---

[8] The government ultimately dismissed the Massachusetts state law charges before the case was submitted to the jury.

figure as an intended loss amount. The Final PSR suggests that at least as to restitution, some accounting of the legitimate services provided by Lynch Associates' (LA) in pursuing the Days Off Lost ("DOL") was in order. As to the Mark43 and Taser counts, the Final PSR uses the full contacted amount as a loss figure with no accounting for legitimate services provided by Lynch Associates.

The government contended in its objections to the draft presentence report that the entirety of the $350,000 paid to Lynch Associates connected to the DOL settlement should be deemed loss. It further argued that the entire amounts received by Lynch Associates through its contracts with the vendors ($20,000 and $138,000 respectively) should be deemed loss, regardless of the good-faith efforts of the lobbying firm. It attributed every dollar of every reimbursement check received by Mr. Pullman as loss. The government advocated for a 14-level increase asserting a total loss between $550,000 and $1,500,000.

The evidence at trial does not support these contentions as to loss by the Probation Department or the government. Mr. Pullman believes that the appropriate guidelines assessment for loss is $38,911.12, as follows:

| TRASACTION | AMOUNT |
|---|---|
| DOL | $20,000.00 |
| MARK43 | $5,000.00 |
| TASER | $5,000.00 |
| Finsilver Meals | $5,247.56 |
| Miami Trip | $3,194.87 |
| NYC Lunch | $468.69 |
| **TOTAL** | **$38,911.12** |

The Guidelines provide that a defendant's loss amount "shall be reduced by ... the fair market value of ... the services rendered ... by the defendant." U.S.S.G. § 2B1.1 *comment*. (n.3(E)(i)). *United States v. Ahmed*, 51 F.4th 12, 25 (1st Cir. 2022). In cases where a defendant's claims are "demonstrably rife with fraud," a sentencing court may use the face value of the

claims as a starting point in computing loss. *Id*. The burden of production then shifts to the defendant who must offer evidence to show why the loss figure should be set at a lower amount. *Id*. "After the record is fully formed, the sentencing court must determine the amount of loss that the government (which retains the burden of proof) is able to establish." *Id*. quoting *United States v. Iwuala*, 789 F.3d 1, 14 (1st Cir. 2015). None of the circumstances surrounding the DOL nor the vendor contracts have been shown to be "demonstrably rife with fraud." Consequently, the guideline loss calculation consideration should rest with the sums provided by Ms. Lynch, rather than some other metric.

Multiple witnesses testified to the extensive work performed by Lynch Associates with respect to the DOL settlement – including organizing and reviewing thousands of paper calendars provided by the State Police haphazardly in trash bags, determining a means to calculate compensation for troopers whose calendars the State Police lost, presenting the findings to the Commonwealth, and advocating for the final settlement agreement and funding. *See* Testimony of Maydad Cohen, Day 9 (Oct. 14, 2022), 158:11-24; 161:4-16; Testimony of Peter D'Agostino, Day 10 (Oct. 17, 2022), 126:13-127:13; Day 11 (Oct. 18, 2022), 46:25-47:9. While one witness, Edward Hunter, testified that he believed the DOL records review should have been conducted by a major accounting firm, he could offer no estimate on what such a firm would have charged SPAM, and most importantly, no witness testified that the $350,000 paid to Lynch Associates was excessive given the level of work performed. *See* Testimony of Edward Hunter, Day 4 (Oct. 4, 2022), 78:18-79:16.

Similarly, Lynch Associates performed bona fide work under its contracts with Mark43 and Taser. Peter D'Agostino explained that the $20,000 fee for work provided to Mark43 was a fair price for their services because of the limited time period for the bid submission, and that if

there had been a longer time period for the work, the amount would have remained the same, just spread out over time. *See* Testimony of Peter D'Agostino, Day 11 (Oct. 18, 2022), 102:1-23. Mark43's founder, Scott Crouch, testified that knowing it could not fulfill all of the parameters of the bid solicitation, the company nevertheless sought to sell its "vision" to the Massachusetts State Police. *See* Testimony of Scott Crouch, Day 7 (Oct. 12, 2022), 77:14-78:9. Mr. D'Agostino was responsive and provided advice on the bid proposal to increase the potential for success. *Id*. at 72:3-22. Importantly, Mr. Crouch testified that at the time the work was being performed by Lynch Associates and Peter D'Agostino, he felt that the work was meaningful. *Id*. at 35:15-21. No witness contradicted Mr. D'Agostino's testimony that the $20,000 fee for the service provided was reasonable.

The trial testimony established that Lynch Associates also performed in good faith on its contract with Taser. Mark Swenson testified that Peter D'Agostino worked to get full deployment of tasers to the State Police, including meeting with legislators, attempting to get amendments added to budget bills and arranging meetings with the leadership of the State Police and Department of Corrections. *See* Testimony of Mark Swenson, Day 9 (Oct. 14, 2022), 33:16-34:24. For his part, Mr. D'Agostino testified that Lynch Associates provided Taser with all the benefits of their contract over a period of months in which they sought to obtain appropriations for the State Police purchase of tasers. *See* Testimony of Peter D'Agostino, Day 11 (Oct. 18, 2022), 115:5-25. As with Mark43, no witness testimony established that either the monthly retainer agreement was unreasonable or that the work performed by Lynch Associates was other than an honest effort at performance under the contract.

With respect to the guideline loss figure connected to Ms. Finsilver, the testimony at trial consisted of the substantive counts involving the New York and Miami charges as well as her

testimony about the meals with Mr. Pullman that were described in Exhibit 246. Mr. Pullman submits that Ms. Finsilver's testimony, as a whole, precludes a determination of any other higher loss amount under the relevant conduct principles of U.S.S.G. §1B1.3. Similarly, Andrew Daly's testimony regarding SPAM's reimbursement practices precludes the finding that the government urges with respect to a loss calculation which includes every expense reimbursement check of Mr. Pullman. Mr. Daly testified that, "…it had to be somewhat reasonably related to SPAM. So if it was a meal, you were taking a SPAM member out or SPAM member and his family that had something to do with SPAM, you were trying to do something to better SPAM, things like that were reimbursable." *See* Testimony of Andrew Daly, Day 5 (Oct. 6, 2022), 51:21-25.

The notion that Lynch Associates' work on the DOL settlement and vendor contracts was completely illusory and thus the sums paid to them entirely ill-gotten is wide of the mark. At most, the total guideline loss experienced by any victim of the DOL settlement and vendor contracts was the $30,000 received from Ms. Lynch. Given the testimony of Ms. Finsilver and the troopers' testimony regarding reimbursements and the activities of Mr. Pullman, no more than the substantive charges from New York and Miami can be sufficiently proven to be considered loss. Therefore, the Court must find that the total loss under the guidelines was no more than **$38,911.12**, justifying only a four-level increase pursuant to U.S.S.G. §2B1.1(b)(1). The resulting Total Offense Level of **20** and resulting in a guideline sentencing range of **33-41 months**.

## II.    Regardless of the Guidelines Range, the Court Should Impose a Variant Sentence of Given Consideration of All the § 3553(a) Factors.

Whether the Court agrees with Mr. Pullman's assessment of the guidelines or the views of the Probation Department or government, a holistic assessment of the factors outlined in 18 U.S.C. § 3553(a) supports a variant sentence of time served with three years of supervised

release that includes twelve (12) months of home-confinement. Such a sentence is adequate to achieve specific and general deterrence, promote respect for the law, protect the public, and avoid unwarranted disparities in the sentencing of similarly situated defendants.

### a. Nature and Circumstances of the Offense, Unwarranted Sentencing Disparities, and General Deterrence

The Court heard lengthy testimony over some eleven days which detailed the nature and circumstances of these offenses. This Court has on more than one occasion lamented the dashed hope expressed by Judge Noonan that bribery involving public officials will someday be consigned to the past. (*United States v. Correia*, No. 18-CR-10364, Sentencing Transcript [D.E. 319], 66:25-69:4; *United States v. Wilkerson*, No. 08-CR-10345, Sentencing Transcript [D.E. 346], 7:24-14:12). Rather than involving the acts of elected public officials, however, this matter features the leader of a collective bargaining unit of troopers and a trooper himself. Notwithstanding the litany of charges pressed by the government suggesting breaches of public trust, the gravamen of Mr. Pullman's offenses is more akin to embezzlement and like offenses that involve a breach of *private* trust. Consequently, the concerns expressed by the Court in cases like *Correia* and *Wilkerson* are largely absent here.

To be sure, the Court has identified offenses involving moral turpitude committed by law enforcement officers as very serious in themselves. The more apt comparisons when considering the 3553(a) factors respecting the nature and circumstances of these offenses, the need to avoid unwarranted sentencing disparities, and general deterrence, are those prosecutions and sentences received by law enforcement officers convicted of financial wrongdoing connected to their status.

In this regard, the recent State Police overtime scandal prosecutions and sentences provide useful data points for determining a reasonable sentence for Mr. Pullman. Beginning

around 2018, allegations surfaced that some troopers within Troop E of the State Police responsible for the Massachusetts Turnpike were suspected of malfeasance relating to overtime pay. In all, some 46 troopers were flagged and had their names referred to state and federal investigators for possible prosecution.[9] Ten of those troopers would be charged in state or federal court.[10] Of the remaining 36 identified troopers not criminally charged, 14 retired and faced no discipline and the State Police sought to terminate 22 troopers.[11] Allegations against the charged defendants included that the troopers did not work any or only some of the overtime shift hours. Beyond simply not working, the troopers often wrote bogus citations because they were expected to find traffic violations during the overtime assignments. The criminally charged defendants received sentences as follows:

| **Defendant** | **Docket** | **Amount** | **Custodial Sentence** |
|---|---|---|---|
| Lt. David Wilson[12] | 1:18-cr-10290-RGS-1 | $12,450 | One day (deemed served); two years supervised release, first three months on home confinement |
| Tpr. Paul Cesan | 1:18-cr-10383-DPW-1 | $29,287 | One day (deemed served); one year supervised release; $5,500 fine |
| Tpr. Gregory Raftery | 1:18-cr-10203-WGY-1 | $51,377 | Three months incarceration; one year supervised release |
| Lt. John Giulino | 1884CR00761 1884CR00961 | $29,108.54 | Two years probation; 100 hours of community service |

---

[9] *See* "Massachusetts State Police overtime scandal: As troopers are sentenced, here is the status of their pensions and benefits." Available at: https://www.masslive.com/boston/2020/02/massachusetts-state-police-overtime-scandal-as-troopers-are-sentenced-here-is-the-status-of-their-pensions-and-benefits.html?utm_campaign=masslivedotcom_sf&utm_ (Last accessed April 23, 2023).

[10] *See* "Twenty-two Mass. State Police troopers to face termination, potential forfeiture of pension in overtime scandal." Available at: https://www.masslive.com/police-fire/2020/01/more-than-a-dozen-massachusetts-state-police-troopers-to-face-potential-forfeiture-of-pension-in-overtime-scandal.html (Last accessed April 23, 2023).

[11] *Id.*

[12] Lt. Wilson pled guilty in Suffolk Superior Court and received a sentence of two years' probation, 200 hours of community service, and ordered to pay $18,994 for receiving more than $31,000 in overtime pay he didn't earn.

| Lt. David Keefe | 1884CR00959 1884CR00762 | $20,000.00 | Two years probation; 100 hours of community service |
|---|---|---|---|
| Tpr. Gary Herman | 1:18-cr-10326-RWZ-1 | $12,468 | One day (deemed served); one year supervised release, first three months on home confinement |
| Tpr. Kevin Sweeney | 1:18-cr-10286-NMG-1 | $11,103 | Two months; one year supervised release, first three months on home confinement; $4,000 fine |
| Tpr. Heath McAuliffe | 1:19-cr-10056-DJC-1 | $7,860 | One day (deemed served); one year supervised release, first six months on home confinement; $4,000 fine |
| Tpr. Daren DeJong | 1:18-cr-10307-MLW-1 | $14,062.50 | Probation for 24 months, the first six months on home confinement; $5,500 fine |
| Tpr. Eric Chin | 1:18-cr-10384-RGS-1 | $7,125 | One day (deemed served); nine months supervised release, first three months on home detention |

Though these represent the criminally charged members of Troop E, many more consented to civil judgements entering against them, some in greater amounts than those charged criminally.

In addition to these sentences of former State troopers, the Court should note the sentence of former New Bedford Police Sergeant and treasurer of the New Bedford Police Union, Joshua Fernandes. Mr. Fernandes used his position as treasurer to wire thousands of dollars from the Union's operating and credit card accounts to pay for personal expenses. *See United States v. Joshua Fernandes*, 21-cr-10215-MLW, Government's Sentencing Memorandum [D.E. 39], at 2. The expenses included vacations, event tickets, cell phone bills, children's toys, and online dating. Fernandes sought to conceal the theft by taking additional funds from a union retirement investment account. Judge Wolf sentenced Fernandes to three months' imprisonment followed by 24 months of supervised release with the first six months served on home confinement and ordered restitution.

Beyond these sentences, other dispositions in this District have involved financial wrongdoing by law enforcement officers, though not necessarily connected with their duties. In

March, Judge Saris sentenced a former Tyngsboro officer to one year and one day incarceration followed by two years of supervised release after the officer pled guilty to bank fraud and firearms offenses. Whitman owned a firearms store and lied in loan applications regarding the true ownership of a planned firing range. *See United States v. Daniel Whitman*, 1:21-cr-10176-PBS, Transcript of Rule 11 Hearing [D.E. 95], at 12-16. The loan application involved millions of dollars, but Whitman ultimately received only a loan of $250,000, which he defaulted on. *Id.* The firearms offenses related to weapons found while executing a search warrant at Mr. Whitman's store. *Id.* at 17-19.

More remotely, former Boston Police Officer Eliezer Gonzalez received a 15-month custodial sentence followed by two years of supervised release on fraud charges related to falsely claiming he received a work-related injury. *See United States v. Eliezer Gonzalez*, 1:10-cr-10085-RGS. Mr. Gonzalez received both injury pay from the City of Boston and supplemental insurance benefits, which became the basis for a restitution order of $167,393.18. Law enforcement observed him feigning injuries and walking with a cane to doctor's appointments on the same day he walked unassisted to run errands.

Collectively, these sentences suggest that the requested sentence of time-served followed by 3 years of supervision with the first twelve (12) months on home confinement is not disparate and would be sufficient to account for the 3553(a) factors.

### b.  Specific Deterrence and Public Protection

At age 62 or older when released, Mr. Pullman presents a vanishingly low risk of recidivism. His several chronic illnesses, including diabetes, hypertension, and a variety of serious cardiovascular issues, *see* above and at PSR ¶ 97 further reduce the prospect of any kind of reoffence.

The Sentencing Commission has found that overall recidivism rates consistently drop as offenders age. United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Key Findings) (December 2017) (available at

https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders). For offenders like Mr. Pullman who are over 60 with no criminal history, the re-arrest rate across all offenses was just 11.3%. *Id.* at Appendix A-44. Moreover, about a quarter of what arrests occurred were for "public order offenses," defined as "violations of conditions of federal probation, federal supervised release, or state parole and crimes such as obstruction of justice and failure to appear." *Id.* at 3 and fn. 6. In addition, the Sentencing Commission's findings note that the overall re-arrest rate was skewed higher by offenders convicted of drug trafficking and firearms possession, strongly suggesting that the actual rate of re-arrest for those, like Mr. Pullman, convicted of non-drug non-firearm offenses is far lower than even the 11.3%.

The Office of the Inspector General reached the same results in a 2015 study. Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, (May 2015) (available at https://oig.justice.gov/reports/2015/e1505.pdf). The study was based on 381 inmates over age 50 released between 2006 at 2010. Id at 39. The three-year arrest rate for inmates aged 55-59 at time of release was 16%. *Id.* For inmates aged 60-64 at time of release it dropped to 8%. *Id.* Mr. Pullman will be outer edge of this cohort by the time of release, an age that suggests an even lower risk of recidivism.

Not surprisingly given these facts, courts frequently have held that advanced age and serious health problems warrant downward variances to sentences outside of prison confinement, and this Court should reach the same conclusion here. *See, e.g.*, *United States v. McFarlin*, 535 F.3d 808 (8th Cir. 2008) (holding that downward variance from 60 months to probation was

reasonable given defendant's age and poor health, as well as post-arrest rehabilitation); *United States v. Wadena*, 470 F.3d 735, 740 (8th Cir. 2006) (holding that downward variance from 18-24 months to probation was warranted in light of defendant's age, deteriorating health, reduced risk of reoffending, and other factors). Indeed, courts recognize that advanced age alone is a common and compelling reason for a downward variance. *See, e.g., United States v. White*, 506 F.3d 635, 640 (8th Cir. 2007) ("With regard to his variance . . . things like the Defendant's age . . . are factors that can and should be considered."); *United States v. Whigham*, 754 F. Supp. 2d 239, 252 (D. Mass. 2010) ("Variances also occur because mitigating factors like mental health [and] age … can now be—and should be—considered."); *see also* U.S.S.G. §5H1. ("Age may be a reason to depart downward in in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.").

Mr. Pullman lived his entire life before this episode – more than six decades – with a spotless criminal record. He has zero criminal history points not because old convictions have simply timed out but because he has never before been charged with a crime. His spotless record underscores his lack of a propensity for criminal conduct[13] and consequently a sentence of confinement within the Bureau of Prisons is unnecessary.

---

[13] Indeed, the U.S. Sentencing Commission agrees. It recently promulgated an amendment to the Sentencing Guidelines, U.S.S.G. §4C1.1, entitled "Adjustment for Certain Zero-Point Offenders." The proposed amendment is available at https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023. The amendment, which is scheduled to go into effect on November 1, 2023, absent Congressional intervention, will provide for a two-point reduction for those, like Mr. Pullman, who have absolutely no prior history of criminal involvement. As the Sentencing Commission put it, "[r]ecidivism data analyzed by the Commission shows . . . that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." *Id.* at 79.

Beyond the broad statistical evidence, the Court can take further note that Mr. Pullman has been on pre-trial release some four years without violation of the terms of his release. He has been given permission to travel with family outside of this district without incident. Indeed, as suggested by Melissa Pullman's letter, he has undergone a complete lifestyle change. Absent the stress of uncertainty attended to the prosecution of this case, Mr. Pullman's days are now spent simply, attending to the needs of his family and their household. Put simply, he is pleased to lead the life of a retired father and grandfather.

In sum, whether it is the lack of recidivism due to age or Mr. Pullman's demonstrated lack of risk while on pretrial release, there is no support for the necessity of a sentence more severe than time served and home confinement to promote specific deterrence or protect the public.

### c.  The Inability of the Bureau of Prisons to Effectively Treat Mr. Pullman's Complicated Medical Issues

If the Court nevertheless considers a sentence of incarceration to be required, the Court must recognize that Mr. Pullman will spend some of his sixties in the custody of the Federal Bureau of Prisons ("BoP"). BoP has long been ill-equipped to care for elderly inmates and the associated medical conditions they present. A 2008 audit by the Office of the Inspector General found systemic deficiencies in the BoP's delivery of health services. U.S. Dept. of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prisons Efforts to Manage Inmate Health Care*, ii-xix, 32-34 (2008) (available at https://oig.justice.gov/reports/BOP/a0808/final.pdf). In 2016, the OIG issued a related report that reviewed the BoP's medical staffing challenges. U.S. Dept. of Justice, Office of the Inspector General Evaluation and Inspections Divisions, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) (available at  https://oig.justice.gov/reports/2016/e1602.pdf).

The review found that chronic staffing shortages "limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." *Id* at i.

The OIG's report specifically flagged the identification and treatment of cardiovascular issues, such as Mr. Pullman's ███████████████████████████████ ████████████, *see* PSR ¶ 97, and called on BoP to address the concern. *Id.* There is little to no evidence that it has. Furthermore, Pullman's health will inevitably decline as he serves his sentence into his sixties and he will require more of exactly the kind of coronary care and other services BoP has been faulted for failing to provide even before the health services crisis BoP continues to experience in the wake of the COVID-19 pandemic. Indeed, the COVID-19 pandemic patently underscored the BoP's already deficient medical resources and its utterly insufficient resources to cope with the task of caring for ill prisoners, with catastrophic results. *See* New York Times, *Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide* (June 16, 2020) (noting, among other things, inconsistent and nonexistent testing of inmate populations);[14] New Yorker Magazine, *Punishment by Pandemic* (June 15, 2020) (documenting indifferent response by facilities to inmate heath during the pandemic).[15] A Marshall Project investigative report found the following in BoP's handling of the coronavirus outbreak:

- Staff ignored or minimized prisoners' COVID-19 symptoms, and mixed the sick and healthy together in haphazard quarantines;

- According to BoP records, thousands of prisoners were shipped around the country at the height of the pandemic, taking the virus with them;

---

[14] Available at https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html.
[15] Available at https://www.newyorker.com/magazine/2020/06/22/punishment-by-pandemic.

- BOP failed to follow its own pandemic response plan, which called for spacing out prisoners; and

- Federal officials have allegedly tried to conceal the extent of the outbreak by limiting testing—so that they didn't have to report positive cases—and refusing to recognize at least one staff death.

The Marshall Project, *"I Begged Them to Let Me Die": How Federal Prisons Became Coronavirus Death Traps,* (June 18, 2020), available at

https://www.themarshallproject.org/2020/06/18/i-begged-them-to-let-me-die-how-federal-prisons-became-coronavirus-death-traps. While shocking, the findings of the Marshall Report citing BoP failures are entirely consistent with chronic deficiency in treating medically vulnerable inmates like Pullman. BoP has been unwilling or unable to address for decades and any confidence this will change in the future is unwarranted.

In short, BoP's delivery of healthcare to inmates is too often spectacularly inadequate and will remain so throughout any term of imprisonment imposed here. Congress has mandated that the Court consider the most effective treatment of Pullman's existing and inescapable future medical issues when fashioning the sentence. 18 U.S.C. § 3553(a)(2)(D). In light of the Inspector General's audit and BoP's continuing failure through the coronavirus pandemic to address life-threatening health issues, there is little reason to believe that BoP will provide even adequate treatment, let alone the most effective treatment, for the inevitable health issues Pullman faces in the coming years. Given this reality, a sentence of time-served followed by 3 years of supervision with the first twelve (12) months on home confinement is far greater than necessary to achieve § 3553(a)'s goals.

### III.    RESTITUTION AND FORFEITURE

The government has asserted restitution is owing as follows:

| Identified Victim | Amount | Mr. Pullman's Response |
|---|---|---|
| SPAM | $184,140.92 | Disputed |
| Mark 43 | $20,000 + $46,020.07 in fees | Disputed |
| Taser | $138,000 | Disputed |
| Commonwealth of Massachusetts | $350,000 | Disputed |
| Internal Revenue Service | $15,044 | Not Disputed |

The Probation Department asserts that restitution "in the amount of at least $184,140.92 is owed to SPAM." It concurs that restitution of $15,044 is owed to the Internal Revenue Service. It defers to the Court regarding how much of the $350,000 paid by SPAM to Lynch Associates constitutes restitution, "and any amount of restitution owed to Mark43, Inc. or Taser International, Inc."

The Mandatory Victim Restitution Act ("MRVA") applies to specified offenses in which an identifiable victim has suffered a pecuniary loss. 18 U.S.C. §§ 3663A(c)(1)(A)(ii), (B). Under the MRVA, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered. 18 U.S.C. §3663A(a)(2). The MRVA requires defendants convicted of a variety of offenses to "reimburse the victim for lost income and necessary childcare, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *In re: Akebia Therapeutics, Inc.*, 981 F.3d 32, 36 (1st Cir. 2020). In calculating the dollar amount to be awarded, the district court need not be absolutely precise. *Id.* The MVRA, "does not cover the costs of a private investigation that the victim chooses on its own to conduct" because, after a close examination of the wording in §3663A(b)(4), the Supreme Court concluded "investigation" is limited to investigations undertaken by the government and

"proceedings" is limited to criminal proceedings. *Id. (citing Lagos v. United States*, 201 L. Ed. 2d 1, 138 S. Ct. 1684, 1690 (2018)). "The district court has the discretion to determine, for each case, which expenses were necessary and foreseeable, and therefore reimbursable. The district court's task is to reasonably determine an appropriate amount for restitution and to ensure the amount awarded has a rational basis in the record." *Akebia Therapeutics*, 981 F.3d at 39.

Respecting the restitution requests which encompass the value of the Lynch Associates contracts with Mark43 and Taser and the $350,000 provided by the Commonwealth to SPAM, Mr. Pullman takes the position articulated *supra* that because of the services rendered in good faith by Lynch Associates, these amounts do not represent pecuniary loss for restitution purposes. Rather, under these circumstances, restitution should be limited to the sums provided from Ms. Lynch to Mr. Pullman – that is, $5,000 to Mark43 and Taser respectively, and $20,000 in the DOL circumstance.

Similarly, and for the reasons argued *supra*, the request of $184,140.92 in restitution to SPAM is unwarranted given lack of support for the proposition that this entire amount is pecuniary loss to the association. Rather, the restitution should be limited to the $8,911.12 involving Ms. Finsilver that is detailed in the guideline determination.

Finally, Mr. Pullman takes the position that the attorney's fees requested by Mark43 are excessive, unnecessary, and unforeseeable to Mr. Pullman. Mark43 chose to engage the New York law firm of Cooley, LLP to assist in preparation of material possessed by Mark43 in response to a grand jury subpoena. Materials provided in support of this request by the firm indicate that Cooley billed at a rate of $1,420.00 per hour for a senior partner and $915.00 per hour for a second partner. The summary of fees provided by the government indicates the firm billed some $33,000 for a subpoena response and grand jury testimony. The subpoena

production, however, was extremely limited and amounted in large part to emails and attachments between Mr. Crouch, his staff, and Lynch Associates. The government's summary further notes that fees related to the trial alone – at which Mr. Crouch testified for one morning – totaled nearly $13,000. The Court should exercise its discretion and decline to award this unreasonable request for unnecessary work.

Mr. Pullman does not dispute that the Court should enter a restitution judgment against him for $15,044 payable to the Internal Revenue Service.

<u>**CONCLUSION**</u>

For the foregoing reasons, Mr. Pullman respectfully requests that the Court sentence him to time served followed by 3 years of supervised release with the first twelve (12) months of supervision to be served on home confinement. The Court should order restitution in the amount of $38,911.12 to SPAM and $15,044 to the Internal Revenue Service. Given the restitution obligation and Mr. Pullman's current and future lack of resources, the Court should decline to impose a fine.

Respectfully submitted,
DANA PULLMAN
By his Attorneys,

*/s/Timothy Watkins*
Timothy Watkins
Brendan Kelley
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA  02210
(617) 223-8061

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on April 25, 2023.

<u>*/s/ Timothy Watkins*</u>
Timothy Watkins