# United States Court of Appeals
## For the First Circuit

---

No. 23-1508

UNITED STATES OF AMERICA,

Appellee,

v.

DANA A. PULLMAN,

Defendant, Appellant.

No. 23-1510

UNITED STATES OF AMERICA,

Appellee,

v.

ANNE M. LYNCH,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

---

Before

Barron, Chief Judge,
Kayatta and Aframe, Circuit Judges.

---

Judith Mizner, Assistant Federal Public Defender, Federal
Defender Office, District of Massachusetts, for appellant Dana A.

Pullman.

    Scott P. Lopez, with whom Lawson & Weitzen, LLP was on brief, for appellant Anne M. Lynch.

    Alexia R. De Vincentis, Assistant U.S. Attorney, with whom Joshua S. Levy, Acting U.S. Attorney, was on brief, for appellee.

————————————

June 2, 2025

————————————

KAYATTA, **Circuit Judge**.  These consolidated appeals arise from the convictions of Dana A. Pullman, former Massachusetts State Police (MSP) trooper and former president of the State Police Association of Massachusetts (the "Union"), and Anne M. Lynch, former head of the political lobbying firm Lynch Associates, for various federal crimes arising out of alleged kickback schemes between the two.

Because the government concedes acquittal should have been entered for the wire fraud convictions of both defendants and for one count of Lynch's tax fraud convictions, we reverse the judgment on those counts.  We also find the evidence insufficient to support Lynch's conviction for obstruction of justice by attempting to manipulate records in response to a subpoena, and therefore reverse on that count.  Otherwise, having considered the defendants' arguments on appeal, we affirm their convictions for honest-services wire fraud, obstruction of justice, conspiracy to defraud the United States, and a racketeering conspiracy.  Our reasoning follows.

## I.

We begin with Pullman and Lynch's challenges to their honest-services wire fraud convictions.  In so doing, "[w]e recount the essential facts of the case, drawn from the trial record, in the light most favorable to the verdict."  United States v. Mubayyid, 658 F.3d 35, 41 (1st Cir. 2011).

**A.**

As head of the Union, Pullman sought to resolve a longstanding dispute with the Commonwealth of Massachusetts (the "Commonwealth") over the payment of troopers for work done on days off, known as the "days off lost" (DOL) grievance. As negotiations with the Commonwealth heated up, Pullman recruited Lynch Associates to help. At that time, Lynch owned the firm, which also employed two of her sons, Peter and Greg D'Agostino.[1] Prior to Pullman's tenure as president, the Union had engaged Lynch Associates for lobbying and public relations work, compensating the firm with a total monthly retainer of $9,500. Pullman also had a longstanding individual relationship with Lynch; they had grown up in the same town, were friends, and had for years worked together on lobbying matters. So, in April 2013, Pullman hired Lynch Associates for the additional project of overseeing the process of compiling and analyzing troopers' calendars to calculate retroactive DOL payments, in addition to participating in negotiations with the Commonwealth.

The terms of Lynch Associates' engagement were set forth in a new written agreement. Under that contract, Lynch Associates agreed to complete the project for a "fixed cost of $200,000," a quarter of which would be paid upfront, with the remainder to be

---

[1] To avoid confusion, we refer to Greg D'Agostino as "D'Agostino" and Peter D'Agostino by his full name.

paid at the presentation of a final report.  The contract further provided that "any changes to th[e] agreement [would] be valid only when agreed upon in writing and signed by both parties."

D'Agostino took the lead on Lynch Associates' work on the DOL grievance.  Per the April 2013 contract, D'Agostino recruited temporary staff to assist with sorting through records; trained them; and began a comprehensive review.  As the work progressed, however, its "scope and detail . . . really exceeded" D'Agostino's and Lynch Associates' expectations.  Because the Union was seeking retroactive overtime pay for its members, prosecuting that grievance required sorting through trash bags full of eight years' worth of paper calendars and developing a formula for addressing missing records.

As a result, in December 2013, D'Agostino and Lynch met with Pullman to ask for an increase to their agreed-upon fee, presenting him with an invoice for close to $500,000 as a revised estimated value for their services on the DOL grievance.  Pullman pushed back on that figure, citing disagreement with the suggested hourly rate for D'Agostino's labor.  At some point later that month, Lynch called D'Agostino to tell him that Pullman came around -- not to the full figure Lynch Associates had requested, but to a total fee of $350,000, up from the $200,000 originally specified in the April 2013 contract.  There was no written

contract or documentation confirming this arrangement to pay an increased fee.

In August 2014, the Union and the Commonwealth reached a settlement on the DOL grievance. The Commonwealth agreed to pay approximately $21 million in retroactive overtime pay to MSP troopers and $9 million in days credited to troopers. The Commonwealth also agreed to reimburse the Union for $350,000 of its expenses incurred in the Union's pursuit of the grievance.

Notwithstanding the settlement of the Union's grievance, Lynch Associates did not immediately receive payment for their work on the grievance. Unbeknownst to Lynch and D'Agostino, Pullman was experiencing pressure from Union officials not to pay the firm more than what the April 2013 contract specified. As Lynch Associates waited for compensation, Lynch called D'Agostino and, according to D'Agostino's testimony at trial, "indicated [to D'Agostino] that [Pullman] had hit her up for a check."

On October 27, 2014, the Union received the Commonwealth's reimbursement check, as per the settlement agreement. On November 5, Pullman visited the office of Union Treasurer Andrew Daly, seeking a $250,000 check for Lynch Associates. Knowing that the Union had already paid Lynch Associates $100,000 in connection with the DOL grievance and believing that the previously agreed-upon total sum of $200,000 was "a hell of a lot of money," Daly objected to this new payment.

He told Pullman that the requested amount "seem[ed] like too much" since Lynch Associates was "already on a retainer," and that it seemed like the Union was getting "fleeced."  In response to these objections, Pullman "banged [his hand] on the desk and told [Daly] to stop breaking his fucking balls and give him the check."  Daly testified that he had never seen Pullman act "like that" before and that he seemed like "a different person."  According to his testimony at trial, Daly felt at the time that he "should have minded [his] own business and just given [Pullman] the check."  He therefore did so without further protest.

The day after the encounter in Daly's office, the $250,000 check from the Union was deposited into Lynch Associates' bank account.  A week later, Lynch took an owner's draw from Lynch Associates' bank account for $50,000, and then cut a $20,000 personal check to Pullman's wife, which was deposited into Pullman and his wife's joint bank account on November 12, 2014.

**B.**

Based on these events, Pullman and Lynch were each convicted of one count of honest-services wire fraud.  The federal wire fraud statute criminalizes the use of wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1343.  To obtain a conviction, the government must show "the defendant's knowing and

willing participation in a scheme or artifice to defraud with the specific intent to defraud." United States v. Falcón-Nieves, 79 F.4th 116, 126 (1st Cir. 2023) (citation omitted).  Section 1343 is supplemented by 18 U.S.C. § 1346, which specifies that the "scheme or artifice to defraud" language in § 1343 includes "a scheme or artifice to deprive another of the intangible right of honest services."  A classic example is a scheme to pay a bribe or a kickback to an agent without the knowledge of the principal. See Skilling v. United States, 561 U.S. 358, 404, 408-09 (2010). The government's claim, in brief, is that the $20,000 paid to Pullman's wife was just such an undisclosed bribe or kickback.

Pullman and Lynch first challenge the sufficiency of the evidence to support their convictions for honest-services wire fraud.[2]  Next, they seek a new trial on the basis of alleged errors

---

[2]  In a pair of footnotes in her opening and reply briefs, Lynch seeks to incorporate by reference Pullman's arguments.  We allow such incorporation in a consolidated case like this one, at least where the evidence is materially the same in the cases against both defendants.  See Fed. R. App. P. 28(i) ("In a case involving more than one appellant or appellee, including consolidated cases, . . . any party may adopt by reference a part of another's brief . . . [and] reply brief[].");  United States v. David, 940 F.2d 722, 737 (1st Cir. 1991) (requiring arguments to be "readily transferrable from the proponent's case to the adopter's case" in order to be incorporated).  Here, the government does not argue that Pullman's arguments do not apply to Lynch, and as a result, we treat Pullman's arguments as applying to both. However, we do not apply Lynch's arguments to Pullman, since he does not request that we do so.  We refer to "Pullman and Lynch" where an argument applies to both -- even if made only in Pullman's briefing -- and only "Lynch" where she makes an independent argument.

in the jury instructions for this count.  Finally, Lynch separately challenges the honest-services wire fraud statute as unconstitutionally overbroad.  We address each argument below.

**1.**

**a.**

Pullman and Lynch preserved their sufficiency-of-the-evidence challenges below by moving for judgments of acquittal on all counts at the close of evidence at trial and by renewing their motions after trial.  See Fed. R. Crim. P. 29(a), 29(c), 33.  We therefore review these challenges de novo.  United States v. Buoi, 84 F.4th 31, 37 (1st Cir. 2023).

We affirm a district court's denial of a request for acquittal if "a rational juror 'could find that the government proved all the elements of the offense beyond a reasonable doubt.'" United States v. Ramos-Baez, 86 F.4th 28, 48 (1st Cir. 2023) (quoting United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021)).  In doing so, we take the evidence in the light most favorable to the government and draw all reasonable inferences in favor of the verdict.  Fuentes-Lopez, 994 F.3d at 71.  "To uphold a conviction, the court need not believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in 'a plausible rendition of the record.'" United States v. Sabean, 885 F.3d 27, 46 (1st Cir. 2018) (quoting United States v. Williams,

717 F.3d 35, 38 (1st Cir. 2013)).  We may uphold a conviction based on circumstantial evidence, id. at 46-47, though we may not "stack inference upon inference in order to uphold the jury's verdict," United States v. Guzman-Ortiz, 975 F.3d 43, 55 (1st Cir. 2020) (citation omitted).

**b.**

To convict Pullman and Lynch of honest-services wire fraud under § 1343 and § 1346, the government had to prove beyond a reasonable doubt that (among other things) the $20,000 check from Lynch to Pullman's wife was a bribe or a kickback.  See Percoco v. United States, 598 U.S. 319, 327-28 (2023); Kelly v. United States, 590 U.S. 391, 398-99 (2020); see also United States v. Abdelaziz, 68 F.4th 1, 29-33 (1st Cir. 2023) (considering whether the government's case evidenced bribery under Skilling). At trial, the government's case centered on the theory that Pullman agreed to cause the Union to make good on his verbal offer of an extra $150,000 to Lynch Associates (above the $200,000 specified in the contract), in exchange for a payment to Pullman from Lynch.

Pullman and Lynch challenge the sufficiency of the evidence to prove this theory.  Specifically, they argue that both bribes and kickbacks require quid pro quos, and here there were none.  The government makes no argument that a quid pro quo was not required, so we assume, without deciding, that it was.  We therefore focus on whether the evidence was sufficient to support

a finding beyond a reasonable doubt of a quid pro quo: an agreement to exchange a thing of value for a favorable act or treatment of some kind.

As a reminder, D'Agostino testified that in December 2013, Pullman and Lynch verbally agreed to increase Lynch Associates' compensation for work on the DOL grievance negotiation from the flat fee of $200,000 enshrined in their previous written agreement to a total of $350,000. Without any documentation to confirm that change (let alone the signed writing required by the contract's terms), Lynch depended on Pullman to find a way to secure full payment. So stood matters when Pullman "hit [Lynch] up for a check." In this manner, the evidence at trial showed that Pullman requested a payment when Lynch Associates had no certain path to enforce its unwritten agreement for increased compensation and when Pullman alone wielded the power to clear that path. It would thus have been entirely reasonable for the jury to infer that Pullman and Lynch reached a coda to their verbal agreement: Pullman would deliver on the payment as agreed back in December 2013, and in exchange, Lynch would give Pullman a cut. See United States v. McDonough, 727 F.3d 143, 153 (1st Cir. 2013) ("[M]ost bribery agreements will be oral and informal . . . ." (citation omitted)). This is exactly the quid pro quo the government needed to prove. See United States v. Gracie, 731 F.3d 1, 3 (1st Cir. 2013) ("When a person with the power to do or not

do something demands a payment from the beneficiary of the exercise of that power as a condition for continuing to do so, the payment is not gratuitous.").

We find Pullman's and Lynch's attempts at alternative explanations unconvincing.  Pullman explains that he was simply "turning to his friend . . . for money . . . at a time the money was available" to her.  Pullman and Lynch also suggest that Lynch's eventual payment to Pullman was merely a "payment made to cultivate a business relationship, express gratitude, or curry favor."  But the jurors were not born yesterday.  Given the foregoing chronology, they could easily have concluded that Lynch caved to the pressure and agreed to cut Pullman a check to ensure her firm received the money.  See Fuentes-Lopez, 994 F.3d at 71.

Pullman and Lynch further argue that Pullman did not need a kickback to make the payment to Lynch Associates; he would have done it anyway, since Lynch Associates' work was just worth that much.  But, as we have explained, as matters stood before the $20,000 check was delivered, Lynch had neither the extra payment nor any contractual right to compensation beyond the "fixed" fee to which Lynch Associates had originally agreed.  And the issue is not whether Pullman should have paid the money; the issue is whether he did so in exchange for a taste himself.  See Gracie, 731 F.3d at 3.

Lynch separately argues that even if the evidence showed that Pullman caused the Union to pay Lynch Associates an extra $150,000 only because they had an agreement that he would receive a cut, this would prove the crime of extortion by fear under the Hobbs Act rather than a quid pro quo. See 18 U.S.C. § 1951(a), (b)(2) (criminalizing the use of extortion to "obstruct[], delay[], or affect[] commerce" and defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"); United States v. Cruzado-Laureano, 404 F.3d 470, 481 (1st Cir. 2005) (explaining that "fear of economic loss" can support a charge of extortion by fear under the Hobbs Act). But the contention that the facts alleged could support one charge is typically no defense to a conviction on another, unless the two crimes are mutually exclusive. See United States v. Facteau, No. 15-cr-10076, 2020 WL 5517573, at *20 (D. Mass. Sept. 14, 2020) (discussing cases where "[c]ourts have determined that convictions are mutually exclusive"). And Lynch cites no authority for her implicit claim that a victim of extortion cannot also be guilty of bribery. Cf. United States v. Buffis, 867 F.3d 230, 235 n.5 (1st Cir. 2017) (rejecting defendant's claim "that proof of bribery cannot be proof of extortion [under color of official right] (and vice-versa)"); Evans v. United States, 504 U.S. 255, 267 n.18 (1992) (noting that

"the modern trend of the federal courts is to hold that bribery and extortion [under color of official right] as used in the Hobbs Act are not mutually exclusive" (cleaned up)).

In sum, we conclude that a jury could reasonably have found the existence of a quid pro quo arrangement between Lynch and Pullman in which Pullman secured an additional $150,000 in compensation for Lynch Associates in exchange for a $20,000 bribe or kickback.[3]  And because defendants do not dispute that the evidence was sufficient to show that Pullman owed a fiduciary duty to the Union of which he was president, we can safely reject defendants' challenges to the sufficiency of the evidence to support the conviction under Count II for honest-services wire fraud.

**2.**

Pullman and Lynch also seek a new trial on their honest-services wire fraud convictions based on asserted flaws in the district court's jury instructions.  Specifically, they argue that the district court incorrectly instructed the jury that Pullman owed a fiduciary duty to the Commonwealth, enabling the jury to return a guilty verdict for honest-services wire fraud on a legally erroneous theory.  Alternatively, they argue that these same

---

[3]  This conclusion also disposes of defendants' contention that, absent proof of a bribe or kickback, there would have been no evidence of a scheme to defraud.

instructions improperly removed a fact-specific determination from the jury.

We do not reach the merits of either argument. Instead, as we explain below, we find that both asserted errors were harmless beyond a reasonable doubt.

**a.**

Both challenges concern the requirement that the government prove that Pullman breached his duty of "honest services," often summarized as the common law obligations of fiduciaries.  See Skilling, 561 U.S. at 402, 407; Percoco, 598 U.S. at 329-30.  At trial, the government had two theories of Pullman's fiduciary obligations: his duties to the Union and the Union members as its president, and his duties to the Commonwealth as an MSP trooper.  Pullman and Lynch did not contest the former; however, they maintained throughout trial -- as they do on appeal -- that Pullman was not a fiduciary of the Commonwealth and indeed could not have been while negotiating the DOL grievance on behalf of the Union against the Commonwealth.

At trial, the district court at times insinuated that Pullman's fiduciary obligations were matters of law; at other times it implied that they were matters of fact for the jury to find. On the whole, we agree with the defendants that the court's remarks collectively could be construed as instructing that Pullman owed a fiduciary duty to the Commonwealth "under these circumstances,"

and that the defendants preserved their objections to that instruction.  The jury's verdict form did not state whether it found that Pullman breached any fiduciary duty to the Union, the Commonwealth, or both -- only that both defendants were guilty of honest-services wire fraud.

### b.

Pullman and Lynch's first challenge to the fiduciary duty instructions described above rests on the Supreme Court's decision in Yates v. United States, 354 U.S. 298 (1957).  In Yates, the defendants were convicted of a conspiracy with two objects: first, "to advocate and teach the duty and necessity of overthrowing the Government," and second, "to organize, as the Communist Party of the United States, a society of persons who so advocate and teach."  Id. at 300.  The Yates Court concluded, however, that the latter conspiratorial purpose fell outside of the relevant statute of limitations, id. at 312, and that the entire conspiracy verdict must therefore be set aside, id. at 311–12.  In reaching that conclusion, the Court reasoned that "the trial court's instructions . . . [were] not sufficiently clear or specific to warrant [] drawing the inference that the jury understood it must find an agreement extending to both" objects of the conspiracy.  Id. at 311.  In this situation, "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected," the "verdict

[needed] to be set aside." Id. at 312; see Abdelaziz, 68 F.4th at 64-65.

Pullman and Lynch contend that the Yates Court's teaching applies to their conviction for honest-services wire fraud. Their argument proceeds in two parts. First, they argue that the challenged instruction was legal error because Pullman could not have owed a fiduciary duty to the Commonwealth while he negotiated against it. Second, they contend that because the jury could have convicted them on the legally erroneous theory that Pullman owed a fiduciary duty to the Commonwealth, the entire verdict as to honest-services wire fraud must be set aside.

We begin and end with the second step of their argument -- assuming arguendo they are correct as to the first. This is because Yates, which suggested automatic reversal was warranted for errors of its kind, was decided before the Supreme Court acknowledged that some constitutional errors at criminal trials could be harmless. See Chapman v. California, 386 U.S. 18, 22 (1967); see also, e.g., Neder v. United States, 527 U.S. 1, 8-15 (1999) (extending harmless-error review to a jury instruction that erroneously omitted an element of the offense). And the Court has since made clear that harmless-error review applies to Yates challenges, reasoning that there is no logical distinction between instructional errors that omit or misstate elements on one hand, and instructional errors that, as in Yates, "aris[e] in the context

of multiple theories of guilt" on the other.  Hedgpeth v. Pulido,
555 U.S. 57, 61 (2008) (per curiam); see also Skilling, 561 U.S.
at 414 & n.46 (clarifying that harmless-error review applies to
Yates errors on both collateral review and direct appeal).

As a result, we apply harmless-error review to Pullman
and Lynch's asserted instructional error.  In doing so, "we are
required to affirm the conviction," United States v. Wright, 937
F.3d 8, 30 (1st Cir. 2019), if "it appears 'beyond a reasonable
doubt that the error complained of did not contribute to the
verdict obtained,'" Neder, 527 U.S. at 15 (quoting Chapman, 386
U.S. at 24); see also United States v. Lyons, 740 F.3d 702, 714
(1st Cir. 2014) (stating that Neder applies to a Yates claim on
direct review); United States v. Zhen Zhou Wu, 711 F.3d 1, 30 (1st
Cir. 2013) (same); United States v. Galecki, 89 F.4th 713, 740-41
(9th Cir. 2023) (applying Neder to a Yates claim on direct review).
In Neder, for example, the Supreme Court considered whether the
district court's omission of an element of the defendant's tax
fraud conviction was harmless beyond a reasonable doubt.  527 U.S.
at 15.  Emphasizing that the evidence presented at trial showing
the omitted element was "so overwhelming" that the defendant did
not contest that it was met, the Court concluded that the error
was harmless.  Id. at 16-17.

The evidence is just as overwhelming here.  To prevail,
it suffices for the government to prove that Pullman owed and

breached a fiduciary duty to the Union -- not to both the Union and the Commonwealth.  See, e.g., Skilling, 561 U.S. at 407 (describing the "solid core" of honest-services fraud cases as involving offenders who violate "a fiduciary duty" (emphasis added)).  And there is no dispute that Pullman was the Union president, that he acted as such in handling the DOL matter, and that a union president acting as such in a union matter has obligations that place him well within the core set of relationships contemplated by the Court's interpretation of § 1346.  See id. at 407 n.41 (listing the relationship between a union official and union members as an example of an uncontested fiduciary duty in the context of honest-services fraud).

At oral argument, counsel for Pullman seemed to intimate that our harmless-error inquiry should always examine each element of honest-services wire fraud to assess its Nader overwhelmingness.  But this argument is unavailing in this case, even were it not waived for being asserted for the first time at oral argument.  See United States v. Pizarro-Berrios, 448 F.3d 1, 5 (1st Cir. 2006).  Here, the government asserted only "a single kickback scheme," such that the jury must have necessarily found that the $20,000 check to Pullman was a kickback in order to convict both defendants.  The government's theory was that this kickback was a breach of Pullman's fiduciary duties, whether to

the Commonwealth or to the Union.[4]  And Pullman and Lynch do not dispute that, if Pullman engaged in a kickback scheme using the Union's funds, Pullman necessarily violated his fiduciary duty to the Union.  In short, given the overwhelming proof that Pullman acted as president of the Union in providing Lynch with a payment from the Union, and given the jury's necessary finding that the redirection of part of the payment into Pullman's pocket was a kickback, there was no danger that any instructional error caused Pullman's conviction for honest-services wire fraud.  Cf. Wright, 937 F.3d at 30 (evaluating harmlessness by examining the evidence as to one of the government's "theor[ies] of guilt" for an element of the crime of conviction).

In sum, beyond any reasonable doubt, Pullman owed a fiduciary duty to the Union, and the existence of that duty fully sufficed to satisfy any requirement that the government prove that his relevant actions in channeling $20,000 from the Union into his own pocket were that of a fiduciary.  It therefore made no difference whatsoever that the jurors may have been wrongly told that Pullman was also a fiduciary of the Commonwealth.

---

[4]  As in Wright, we see no basis for concluding that the government "forced or urged the jury to" adopt the problematic theory of guilt, which here concerned Pullman's violation of a fiduciary duty he owed to the Commonwealth, by substantially emphasizing that theory over the valid theory that Pullman violated a fiduciary duty he owed to the Union.  937 F.3d at 30 (cleaned up).  We therefore need not decide how our harmless-error analysis would be affected had the government done so.

### c.

Pullman and Lynch also argue they are owed a new trial because the question of whether Pullman owed a fiduciary duty to the Commonwealth should have been left to the jury.  See United States v. Argentine, 814 F.2d 783, 788 (1st Cir. 1987) ("Undeniably inherent in the constitutional guarantee of trial by jury is the principle that a court may not step in and direct a finding of contested fact in favor of the prosecution . . . .").  But our holding of harmless error also disposes of this concern, since defendants make no argument that the jury's factfinding role was disturbed as to the question of Pullman's fiduciary duties to the Union.  See United States v. Rivera-Santiago, 107 F.3d 960, 965–67 (1st Cir. 1997) (applying harmless-error review to the argument that the district court's answer to a question from the jury removed a factual question from the jury's purview); Argentine, 814 F.2d at 788–90 (same).

### 3.

As an alternative challenge to her honest-services fraud conviction, Lynch contends that 18 U.S.C. § 1346 is unconstitutionally vague as applied to her.  But her challenge poses a question that the Supreme Court has already taken up: whether undisclosed self-dealing can be properly subject to liability under § 1346.  See Skilling, 561 U.S. at 409.  In Skilling, the Court resolved that question by limiting § 1346 to

encompass only schemes for bribes or kickbacks. Id. at 410-13. And here, Pullman and Lynch were convicted on the theory that they participated in a scheme that involved bribes or kickbacks, a theory that falls well within the limits of the statute as sketched by Skilling. Lynch's challenge to her conviction, therefore, masquerades as constitutional when it in substance takes issue with the sufficiency of the evidence to show a kickback scheme -- an argument we rejected above.

Lynch also argues that Skilling was wrongly decided because it "legislated a new federal law." See 561 U.S. at 415 (Scalia, J., concurring in part and concurring in the judgment) (asserting that the majority should have struck § 1346 down rather than impermissibly rewriting it in order to find it constitutional); see also Percoco, 598 U.S. at 333-38 (Gorsuch, J., concurring in the judgment) (same). But we are bound by the majority decision in Skilling unless and until the Court changes its mind.

For these reasons, we see no merit in Lynch's constitutional challenge to § 1346.[5]

---

[5] Lynch also contends for the first time on reply that Skilling did not resolve the question of which fiduciary duties can support a conviction under § 1346. But she fails to advance the necessary next step of her argument: that § 1346 did not provide sufficient notice that Pullman's fiduciary duties, as proven by the government, fall within its ambit. As a result, this argument is doubly waived -- for being asserted for the first time on reply, see Sparkle Hill, Inc. v. Interstate Mat Corp., 788

In sum, none of Pullman's or Lynch's challenges to their convictions for honest-services wire fraud succeed.  We therefore affirm the district court's denial of their motions for acquittal as to those convictions.

## II.

We next turn to the subject of tax fraud.  Lynch and Pullman were convicted of two counts each of tax fraud under 26 U.S.C. § 7206(2).  Pullman does not challenge his tax fraud convictions on appeal, and we address Lynch's challenges to hers infra.  But both challenge their convictions under 18 U.S.C. § 371 for conspiring to, as described in the indictment, "conceal illegal bribes, kickbacks and other payments" for the purpose of defeating Internal Revenue Service (IRS) tax-collection functions -- often referred to as a Klein conspiracy.  See Mubayyid, 658 F.3d at 57. See generally United States v. Klein, 247 F.2d 908 (2d Cir. 1957). A Klein conspiracy conviction requires the government to establish beyond a reasonable doubt "both 'an agreement whose purpose was to impede the IRS (the conspiracy),' and the knowing participation of each defendant in that conspiracy."[6]  Mubayyid, 658 F.3d at 57

---

F.3d 25, 29 (1st Cir. 2015), and for underdevelopment, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[6] Defendants' tax fraud convictions were charged as the necessary overt acts in furtherance of the Klein agreement, see United States v. Frankhauser, 80 F.3d 641, 653 (1st Cir. 1996), and defendants do not dispute this element of their Klein conspiracy convictions on appeal.

(quoting <u>United States</u> v. <u>Adkinson</u>, 158 F.3d 1147, 1154 (11th Cir. 1998)).

**A.**

At trial, the evidence of a <u>Klein</u> conspiracy focused on a series of payments from Lynch to Pullman. The first was the $20,000 that Lynch paid to Pullman's wife in connection with the DOL matter, discussed <u>supra</u>. That payment came from a $50,000 owner's draw from Lynch Associates, which Lynch later reclassified in the firm's records as a consulting payment to Pullman's wife. The government also presented evidence of four other payments in sums between $5,000 and $9,000, from Lynch's personal account or Lynch Associates' account, to either Pullman or his wife, in connection with other business dealings. These were each classified in the firm's books as commissions or consulting payments.

Pullman did not report any of the above income on his joint tax returns. At the same time, Lynch Associates did not issue a Form 1099 to Pullman or his wife for any of the payments, despite, when necessary, issuing such forms for payments made to others. Thus, the IRS received no report of these payments from either the payor or the payees.

**B.**

Pullman and Lynch argue that, while they each may have committed tax fraud, there was insufficient evidence that they

conspired to do so. But "[b]y their very nature, criminal
conspiracies are clandestine and inchoate." Id. It is a "well-
established legal principle that a conspiracy may be based on a
tacit agreement shown from an implicit working relationship."
United States v. Patrick, 248 F.3d 11, 20 (1st Cir. 2001),
overruled on other grounds by United States v. Salvador-Gutierrez,
128 F.4th 299 (1st Cir. 2025) (en banc). And here, Lynch's
repeated non-reporting and Pullman's repeated non-reporting worked
in tandem to reduce the risk that a report by either one would
have pointed the finger at the other. It is reasonable to infer
from this parallel concealment that neither Lynch nor Pullman would
have taken the risk of not reporting the payments each year absent
some assurance that the other person was also not reporting the
payments. And their long history with each other in channeling
money to Pullman enhances the plausibility of that inference. For
those reasons, the jurors had a basis to regard the tax reporting
not as two separate endeavors but as the product of mutual
coordination.

       As a result, we affirm Pullman's and Lynch's convictions
for a Klein conspiracy.

### III.

       We next turn to Pullman and Lynch's challenge to their
convictions for obstruction of the grand jury proceedings. We

first review the evidence for the government's case and then turn
to the parties' arguments.

### A.

The following evidence was presented at trial. On
August 1, 2018, the Union received a grand jury subpoena requesting
various financial records.[7] Daly took it as a sign that more would
be coming and began to prepare by collecting the Union's expense-
reimbursement records. Although he found several years' worth of
records quickly, he soon discovered that three years' worth of
records were missing. Thinking they were misplaced or lost during
a recent office renovation, Daly began a more in-depth search. He
also called Pullman to let him know that he couldn't find the
records, telling Pullman, "I'm just going to have to tell the
government that I lost them or misplaced them in the move." In
response, according to Daly's testimony at trial, Pullman asked
Daly to lie -- "Can't we just tell them we have an internal policy
to destroy them after a year?" And Daly responded, "I don't think
that's an option."

Daly had still not found the missing reimbursement
records by the time the next subpoena arrived on September 18,
2018. As Daly had predicted, that second subpoena requested, among

---

[7] This was the second grand jury subpoena to arrive; the
first, on July 11, 2018, requested records of the Union's campaign
contributions.

other things, expense-reimbursement records, including receipts
and debit card records.    In response to the subpoena, Pullman
provided some receipts from 2018, but records from some previous
years were still missing.    At that point, Pullman and Daly met to
discuss the September 18 subpoena in the Union office, and Pullman
again proposed that Daly falsely "tell them that we have an
internal policy to keep them for a year and then destroy them[.]"
And again, Daly responded, "I don't think we can do that.    I think
I'd probably get charged with obstruction.    I'm just going to have
to fall on my sword and say that I lost them."    Daly knew it would
probably be considered obstruction to do as Pullman suggested
because he had researched the question after the first time Pullman
brought it up.

Sometime after the Union received the September 18
subpoena, Pullman also called the Union attorney in charge of
responding to the subpoenas, Leonard Kesten, and asked Kesten to
speak with Lynch.    Shortly thereafter, and several days before
Pullman resigned as president of the Union, Lynch called Kesten
and asked him if he "would delay the production of the documents
contained in the subpoena because [Lynch and Pullman] were still
looking for receipts."    Kesten testified at trial that this request
made him "uncomfortable" because he understood it to mean a request
for him to "hold off so that [documentation] could be put into the

documents" prior to responding to the subpoena.  Kesten refused the request.

On October 17, 2018, Federal Bureau of Investigation (FBI) special agents interviewed Lynch at her home in Hull, Massachusetts.  During the interview, the agents reminded Lynch several times that lying to federal agents was a crime.  They also asked several times if Lynch had made any payments from her personal account or from Lynch Associates' account to Pullman or his wife.  In response, Lynch stated that "she had never made any payments" nor any "loans" to Pullman or his wife.  She also stated that she spoke with Pullman recently but had not had any conversations with him about the federal investigation.  And she averred that Pullman had mentioned nothing about his or SPAM's expense reports.

**B.**

Based on the above events, Pullman and Lynch were each charged under the catch-all or "[o]mnibus [c]lause" of 18 U.S.C. § 1503(a), United States v. Aguilar, 515 U.S. 593, 598 (1995), which criminalizes anyone who "corruptly . . . influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice."  Both defendants were convicted on one count each for "attempting to manipulate records required to be produced pursuant to a [sic] grand jury subpoenas."  In addition, Lynch was convicted of a separate count for "falsely

denying to Special Agents of the FBI and IRS that she ever made any payments to either Pullman or his spouse" and "falsely denying she had ever had any conversations with Pullman about the ongoing grand jury investigation."[8]

### 1.

We focus first on Pullman and Lynch's convictions for "attempting to manipulate records" in response to the September 18 subpoena, applying de novo review and "evaluating the evidence and all plausible inferences therefrom in the light most favorable to the verdict to determine whether a rational factfinder could conclude beyond a reasonable doubt that [defendants] committed the charged crime." United States v. Pena, 24 F.4th 46, 73 (1st Cir. 2022).

Pullman and Lynch pose two challenges to these convictions. First, they argue that there was insufficient evidence to show their specific intent to obstruct the grand jury investigation beyond a reasonable doubt. Alternatively, they argue that neither Pullman's request to Daly nor Lynch's request to Kesten constituted an "endeavor[]" to obstruct the grand jury proceedings under 18 U.S.C. § 1503(a). We address each in turn.

---

[8] Pullman and Lynch were each also convicted of aiding and abetting the obstruction of justice under 18 U.S.C. § 2, which merged into the principal convictions at sentencing. On appeal, Pullman and Lynch decline to raise any basis for challenging their aiding and abetting convictions apart from the challenge to the principal convictions.

**a.**

A conviction under the omnibus clause of § 1503(a) requires that a defendant specifically intend to obstruct the judicial proceeding in question. See, e.g., Aguilar, 515 U.S. at 599.[9] The Supreme Court has emphasized that this element requires a nexus to the judicial proceeding, such that a defendant's actions have the "'natural and probable effect' of interfering with the due administration of justice." Id. (quoting United States v. Wood, 6 F.3d 692, 695 (10th Cir. 1993)). Thus, in Aguilar, the Court overturned a conviction where the defendant lied to an FBI agent knowing of an ongoing grand jury investigation but not that his statements would be provided to the grand jury. Id. at 600–01 ("[W]hat use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is . . . speculative.").

Pullman and Lynch first briefly contend that Pullman's request to Daly that the Union fabricate a document destruction policy in response to the September 18 subpoena does not show his intent to obstruct beyond a reasonable doubt. So, too, at oral argument, counsel for Pullman suggested that we should interpret Pullman's question to Daly as an inquiry about what would be

---

[9]    The parties do not contest the other two elements of their obstruction convictions; namely, that there was a pending judicial proceeding and that defendants had notice of that proceeding. See United States v. Acevedo, 882 F.3d 251, 257 (1st Cir. 2018).

proper, not an invitation to lie.  But Pullman had no need to inquire as to whether lying to a grand jury was wrong.  Jurors could therefore easily construe the twice-made inquiry as a proposal to lie rather than an inquiry about what was proper.  And unlike in Aguilar, here the relationship to the grand jury was clear:  Daly's testimony was that Pullman's proposal was a direct and knowing response to a grand jury subpoena.  As such, the jury could have reasonably found that Pullman had the specific intent necessary to convict him of obstruction.

The evidence to show Lynch's intent to obstruct is a different matter.  At trial, the only evidence as to her intent to obstruct the production of documents was testimony about her phone call to the Union attorney Kesten, in which she asked him to "delay the production of the documents contained in the subpoena because [defendants] were still looking for receipts" and told him "that she was going to assist [Pullman] in getting his receipts."  Without evidence that Lynch knew what was in the records or why Pullman wanted more time, her request to delay production in order to help Pullman find receipts is not itself nefarious -- especially in light of an FBI agent's testimony that rolling productions were not uncommon and Kesten's testimony that other Union officials were in the process of gathering documents in response to the subpoena.  Moreover, the subpoena itself asks only for "[e]xpense reimbursement records including requests, supporting documents,

receipts and proofs of purchases"; it does not distinguish between records kept in the ordinary course of business and records Pullman may have kept elsewhere, despite the fact that Kesten interpreted it to do so.  We therefore conclude that a reasonable jury could not have found beyond a reasonable doubt that Lynch had the requisite intent to obstruct the grand jury.

**b.**

Pullman launches one more challenge to his obstruction conviction, arguing that, even if he intended to manipulate records in response to the subpoena, his actions did not rise to the level of an "endeavor."  See 18 U.S.C. § 1503(a) (prohibiting any "corrupt[] . . . endeavor[] to influence, obstruct, or impede, the due administration of justice").  Specifically, he argues that he did not exert any "pressure or follow-up" on Daly when he refused Pullman's requests to fabricate a document destruction policy.[10]

But Pullman mischaracterizes the meaning of "endeavor." In Aguilar, the Supreme Court emphasized that a defendant need not be successful in the obstruction of justice to be convicted under the omnibus clause of § 1503(a); where a "defendant acts with an intent to obstruct justice, and in a manner that is likely to

---

[10] Pullman also makes the same lack-of-pressure argument about Lynch's call to Kesten.  But because we have already concluded there was insufficient evidence to support Lynch's conviction for obstruction based on that call, we focus here on the evidence that Pullman asked Daly to lie.

obstruct justice, but is foiled in some way," they have "endeavor[ed]" to obstruct justice. 515 U.S. at 601-02. And we have repeatedly held that an "endeavor[]" under § 1503(a) need not rise to the level of criminal attempt. See United States v. Tedesco, 635 F.2d 902, 907 (1st Cir. 1980); United States v. Lazzerini, 611 F.2d 940, 941 (1st Cir. 1979). Thus, contrary to Pullman's argument, the requirement that a defendant "endeavor[]" to obstruct justice does not mandate a greater degree of effort or persistence.

Pullman also asks us to infer a repetition requirement from our decision in Tedesco, where the defendant had suggested a grand jury witness change his testimony in at least three separate conversations. See 635 F.2d at 903-04. But there, we trained our focus on rejecting the defendant's contention that he could not be convicted of obstruction where his efforts were not explicit, and nowhere did we suggest that the number of efforts was dispositive. Id. at 906-07. While repetition may be relevant in distinguishing musings from actual endeavors, it is not always required to support a finding of an endeavor. See United States v. Acevedo, 882 F.3d 251, 256-57, 259-60 (1st Cir. 2018) (upholding a conviction under § 1503(a) where defendant once requested that a cooperating witness "retract" his account); see also United States v. Roe, 529 F.2d 629, 631 (4th Cir. 1975) (same where defendant spoke on the phone once to a juror's husband); United States v. Russell, 255

U.S. 138, 141-42 (1921) (upholding a conviction under § 1503(a)'s predecessor statute where defendant spoke on the phone once to a juror's wife).

The pivotal inquiry as framed in <u>Aguilar</u> is foreseeability. <u>See</u> 515 U.S. at 599 (holding that a defendant "endeavor[s]" by taking actions with the "'natural and probable effect' of interfering with the due administration of justice" (quoting <u>Wood</u>, 6 F.3d at 695)). And here, where the government's case was that Pullman -- the president of the Union -- point blank asked the Union's secretary to lie to the grand jury, we think it clear that fabrication was foreseeable. This holds true regardless of whether Daly did or did not resist the clear request.[11] As such, we hold that the jury could have fairly understood both actions as "endeavor[s]" under <u>Aguilar</u> and § 1503(a).

In sum, although we reverse Lynch's conviction for attempting to manipulate records in response to a subpoena, Pullman's conviction for the same was proper where the evidence was sufficient to show he "act[ed] with an intent to obstruct justice, and in a manner that [was] likely to obstruct justice, but [was] foiled." <u>See</u> <u>id.</u> at 601.

---

[11] As Pullman points out, the first time he asked Daly to lie was in response to the August 1 subpoena request, an incident that is out of the timeframe of the indictment. But the second, repeated request falls within the timeframe.

**2.**

Lynch was also convicted on a separate charge of obstruction under § 1503(a) for lying to FBI agents during the interview at her home in 2018. Her only challenge to this conviction on appeal is an assertion of another <u>Yates</u> error: that she is owed a new trial because the jury was improperly instructed on honest-services fraud and wire fraud and therefore "relied on unsound fraud theories . . . to reach a verdict on" the obstruction charge.

Lynch did not make this argument before the district court, so it is subject only to review for plain error. <u>See</u> <u>United States</u> v. <u>Rodríguez-Santos</u>, 56 F.4th 206, 218-19 (1st Cir. 2022). But in her briefs to us, Lynch proffers no plain-error analysis, thereby waiving her argument altogether. <u>See</u> <u>United States</u> v. <u>Rathbun</u>, 98 F.4th 40, 58 (1st Cir. 2024) ("[B]ecause [defendant] does not acknowledge his failure to preserve his objection below or provide us with a plain error analysis of his . . . argument in his opening brief, the argument is waived, and we need say no more."); <u>see also</u> <u>United States</u> v. <u>Rodriguez-Monserrate</u>, 22 F.4th 35, 40 (1st Cir. 2021) (treating an argument of procedural error at a criminal trial that failed to articulate its status on plain-error review as waived); <u>United States</u> v. <u>Pabon</u>, 819 F.3d 26, 33 (1st Cir. 2016) ("Pabon has waived these challenges because he has

not even attempted to meet his four-part burden for forfeited claims . . . .").[12]

 As a result, we affirm her second conviction under § 1503(a).

## IV.

 With the bulk of Pullman's and Lynch's convictions behind us, we can now turn to the low-hanging fruit.

## A.

 Separately from the honest-services wire fraud convictions for the DOL grievance payment, Pullman and Lynch were also convicted of three counts each of wire fraud under 18 U.S.C. § 1343. These convictions were based on payments Lynch made to Pullman after Pullman helped Lynch Associates secure contracts with two companies vying for the Union's support.

 Pullman and Lynch challenge the sufficiency of the evidence for their wire fraud convictions. Alternatively, they contend a new trial is warranted on the basis of an error of jury instruction. However, we need not reach either of these arguments. Although the government defended these convictions below, on appeal, it concedes that judgments of acquittal should be entered for all counts of wire fraud "[i]n light of the manner in which

---

 [12] Lynch makes this same <u>Yates</u> argument with respect to her convictions for tax fraud. These arguments are both forfeited and waived for the same reasons as her argument concerning her second § 1503(a) conviction.

the evidence developed at trial and post-trial developments in the law."    Following the government's lead, we reverse these convictions.

The government also concedes acquittal is warranted for Count D, one of Lynch's tax fraud convictions related to the above-mentioned counts of wire fraud.  We therefore also reverse Lynch's conviction on this count.

### B.

Finally, Pullman and Lynch challenge their Racketeer Influenced and Corrupt Organizations Act (RICO) conspiracy convictions, which are based on events already described.  See 18 U.S.C. § 1962(d).  Both defendants were charged with "conduct[ing] and participat[ing] . . . [in] a pattern of racketeering activity" consisting of the predicate acts of honest-services wire fraud, wire fraud, and obstruction of justice.  See id. § 1961(5) (defining a pattern of racketeering activity to include "at least two acts of racketeering activity"); id. § 1961(1) (defining acts of racketeering activity to include wire fraud and obstruction of justice).  Pullman and Lynch's sole argument is that their RICO charges fail because "the evidence failed to establish that [their] conduct constituted wire fraud or obstruction."  But this contention gets them nowhere:  Even putting aside the wire fraud convictions that the government concedes should be overturned, we

have already held that the evidence supports the obstruction and honest-services wire fraud verdicts.[13]

As a result, Pullman and Lynch's challenge to their RICO conspiracy convictions fails.

**V.**

For the reasons stated, we **reverse** Pullman's and Lynch's wire fraud convictions under Counts III–V; Lynch's obstruction of justice conviction under Count VIII; and Lynch's tax fraud conviction under Count D. We **affirm** defendants' other convictions. The case is **remanded** to the district court for resentencing in light of this decision.

**So ordered.**

---

[13] Pullman and Lynch raise no argument that the obstruction and honest-services wire fraud convictions are not related or that they do not threaten continued criminality, requirements for predicate acts to support a RICO conviction. See H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239–40 (1989) (holding that two or more predicate acts become a pattern of racketeering activity under RICO only when they are both "related, and . . . amount to or pose a threat of continued criminal activity"). As a result, we do not address these issues.